**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ray Owen SLAUGHTER,**
**Defendant–Appellant.**

**No. 88–1302.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 12, 1989.

Decided Nov. 22, 1989.

Daniel Markoff, Federal Public Defender, and Randall J. Roske, Chief Asst. Federal Public Defender, Las Vegas, Nev., for defendant-appellant.

William A. Maddox, U.S. Atty., and Anne Kristina Perry, Asst. U.S. Atty., Las Vegas, Nev., for plaintiff-appellee.

Before WALLACE and NOONAN, Circuit Judges, and ZILLY, District Judge.*

ZILLY, District Judge:

Ray Owen Slaughter was convicted on two of three counts of distribution of a controlled substance (cocaine) in violation of 21 U.S.C. § 841(a)(1). Slaughter appeals his convictions alleging outrageous governmental misconduct, the trial court's failure to admit certain out-of-court statements of a witness who was unavailable at the time of trial and challenging the court's failure to give certain jury instructions on entrapment. We have jurisdiction under 28 U.S.C. § 1291. We reverse.

---

* The Honorable Thomas Zilly, United States District Judge for the Western District of Washing- ton, sitting by designation.

## FACTUAL AND PROCEDURAL BACKGROUND

Slaughter began working as a polygraph examiner in 1973 in the office of the Clark County Public Defender in Las Vegas, Nevada. For several years, Slaughter worked as a contract employee for the county, and also conducted his own business simultaneously. While he worked as a polygraph examiner, Slaughter had occasion to review various polygraphs involving sensitive criminal investigations in the Clark County area. In 1977, another police polygrapher, Charles Lee, had concluded that former Judge Harry E. Claiborne "had told the truth" about allegations that Claiborne, prior to becoming a judge, had retained a private investigator for the purpose of illegally planting an electronic eavesdropping device. The matter was then closed as to Mr. Claiborne. In 1980, after Claiborne had been appointed to the bench, the FBI began investigating the same issue again and Charles Lee was subpoenaed to testify before the grand jury about his 1977 polygraph charts and findings. Lee believed he was "in the middle of a war between the head of the FBI and a federal judge" and complained to Clark County authorities. A decision was made to have every governmental polygraph examiner in Clark County review Lee's 1977 charts and findings on the Claiborne matter. Slaughter was one of four people who reviewed the Claiborne polygraph charts and Slaughter, as well as the other examiner, all agreed with the earlier findings of Lee.

In 1982, Slaughter tested Clark County Sheriff John Moran as a result of remarks Moran made during his campaign for reelection. Moran's opponent had made remarks about Moran's underworld connections with Frank Cullotta which were made public just after Moran had won the Democratic primary election. Sheriff Moran, in an effort to counter these allegations, took and passed a polygraph test administered by Slaughter. The test results were made public. After the release of the results, new allegations were made that Slaughter had improperly passed Cullotta in a prior polygraph examination.

In 1987, Slaughter conducted a polygraph on two Las Vegas police detectives suspected of theft from certain safety deposit boxes at the Western Vault Company in Las Vegas. The two detectives, Edward Schaub and Steve Scholl, were tested by Slaughter regarding thefts occurring at the local vault where drugs and cash, maintained as evidence by the police, had been stored. Slaughter passed both detectives at the time of the polygraph. The government's confidential informant in this case told the FBI that Slaughter admitted in their first meeting that he "had polygraphed some metro police officers who lied." (Ex. "U"; RT G.T. EH 52–53). After Slaughter's arrest in this case, the FBI requested that Schaub and Scholl take additional polygraphs. (RT I EH 201, 246–247).

Commencing in about 1981, Slaughter began using cocaine. Rumors that Slaughter used and distributed cocaine circulated in the Las Vegas law enforcement community for several years. However, because of Slaughter's long time association with the law enforcement community in Las Vegas, it was difficult for any agency to conduct an investigation into these rumors. In 1987 Slaughter was targeted by federal officials for investigation. SSA Togliatti, head of the political corruption squad, is the government agent who began the investigation of Slaughter using informant Belinda Antal.

On April 11, 1987, Belinda Antal moved to Las Vegas with her boyfriend Freddie. Antal's move to Las Vegas was prompted by her participation as an undercover informant for the FBI in a drug and gambling case in Rochester, New York. Antal assisted the FBI in New York in order to help her boyfriend, Freddie, avoid charges of selling cocaine. As a result of Antal's help, Freddie and Antal were relocated at government expense to Las Vegas. Before leaving Rochester, New York, Antal told the FBI that if there was anything that she could ever do for them "they could call upon me." (RTBA EH 17) Immediately upon her arrival in Las Vegas, Antal met with Rochester, New York FBI agents who introduced her to Las Vegas SSA George

Togliatti. (RT II 60–63). In a conversation with Togliatti, Antal advised him that she formerly resided in Las Vegas and had frequented a lounge/bar called Mickey's Appetizers. Togliatti recalled that Slaughter also frequented the same bar and asked Antal if she knew him. (RT II 60; RT 1117). Antal was uncertain, but agreed to give Slaughter a call to see what would happen. Thus began the events giving rise to the criminal charges here at issue.

On approximately April 14, 1987, Antal first called Slaughter. She gave him her name and said she was back in town looking for work. He said he remembered her from Mickey's Appetizers and they arranged to meet later that day at the Prime Rib Restaurant. At the appointed time and place, Antal met Slaughter. He acted as if he knew her, although she did not recognize him. (RT I, 21). Slaughter found Antal to be "a very attractive young lady" who was provocatively dressed. At the time Antal was a six foot tall, 24 year old woman. Slaughter was a 52 year old divorcee.

During Antal's first meeting with Slaughter, they were joined by another woman, Robin Kenny. Thereafter, Antal observed Robin and Slaughter pool their money, $50 each, to purchase a gram of cocaine. (RT I 23–25; RT II 73–74, RT III 186). Slaughter left their table in the restaurant, walked into the kitchen area and then returned. Shortly thereafter, a chef named "Ricardo" came to the table and slipped Slaughter a package. (RT I 24). Slaughter gave the package to Robin who then proceeded to the restroom. She returned and handed the package back to Slaughter who then proceeded to the restroom. Slaughter returned to the table and the three then agreed to go to Slaughter's condominium. (RT I 26; RT II 78; RT III 187). At Slaughter's residence, Antal saw Slaughter and Robin use cocaine, but she categorically denied using any cocaine. (RT I 27, RT II 80). In contrast, Slaughter testified that Antal used cocaine, that he was impressed with the large quantity of

cocaine she could ingest, and he felt she was obviously no amateur. (RT III 187–88). At trial, Antal admitted using cocaine on eight or nine prior occasions (and maybe two more occasions) but denied being a habitual user. (RT II 82, 137). On cross examination, Antal admitted living with a cocaine vendor (Freddie) who had no other occupation at that time. At trial, Slaughter attempted to introduce Robin Kenny's out-of-court statements to Mr. Herb Barrett, investigator for the Federal Public Defender, that Antal had, indeed, used cocaine on April 14, 1987 when she first met with Slaughter. The trial court refused to permit Barrett's testimony to be heard by the jury.

The next day, Antal called agent SSA Togliatti and reported what had happened. Togliatti told Antal to recontact Slaughter to see if she could buy cocaine from him (RT II 90) and Togliatti assured Antal that she would be paid for her work. (RT II 86). Due to an illness, several days passed before Antal could again contact Slaughter. On April 26, 1987 she called Slaughter at the Public Defender's office. (RT I 31; RT II 91; RT III 191). In a conversation which was tape recorded by the FBI, Antal asked Slaughter if she could "get something" from him to which he responded "no" on eleven separate occasions. (Tape recording, Ex. 4; RT II 91).

On April 28, 1987, Antal again called Slaughter and a meeting was arranged. Later that day, Antal, carrying a tape recorder, met Slaughter at Darci's Bar and Grill. During the conversation Antal brought up the possibility of getting some cocaine at the Prime Rib from "Richard." (TR BT April 28, 1987 22; Ex. 1). Thereafter, they went to a location where Antal obtained $200 in order to buy cocaine from Slaughter.[1] They then proceeded to the Prime Rib Restaurant where Antal gave Slaughter the $200 in exchange for a gram of cocaine which Slaughter had obtained from "Ricardo." Antal subsequently turned the cocaine over to the FBI.

---

**1.** During the drive back to the restaurant, Slaughter and Antal discussed the possibility of Antal moving in with Slaughter. Other provoca-tive and sexually explicit topics were also discussed.

On April 30, 1987, Antal again met Slaughter at the Prime Rib Restaurant. (Ex. 2; TR BT April 30, 1987 p. 1). Antal brought up the subject of cocaine (Ex. 2) and Slaughter agreed to sell Antal an "eight-ball" (⅛ ounce) of cocaine for $250. Slaughter then went into the kitchen and returned. While the two were seated at the restaurant, Slaughter handed Antal a package of cocaine. (Ex. 2; TR BT April 30, 1987, p. 34).

On May 2, 1987, Antal had another conversation with Slaughter and invited him to her hotel suite for a party (Ex. 8). Slaughter refused and they agreed to meet him at the Prime Rib later that day. At the restaurant Antal told Slaughter she wanted to buy more cocaine. Slaughter sold Antal cocaine in exchange for $250. Slaughter had obtained this cocaine from "Ricardo." Later on the evening of May 2, Antal and Slaughter met at the Bavarian Chalet. Slaughter was arrested upon leaving the Bavarian Chalet.

Slaughter was charged with three counts of distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1). Prior to trial, Slaughter moved to dismiss the indictment based on outrageous government misconduct. The motion was denied. After a trial to a jury, Slaughter was acquitted on the first count (relating to the sale of cocaine on April 28, 1987) and convicted on the second and third counts of distribution (relating to the sales of cocaine on April 30 and May 2). Slaughter filed a timely appeal to this Court. For the reasons outlined below, we reverse the convictions and remand for a new trial.

## DISCUSSION

A. *Outrageous Governmental Misconduct or Application of The Court's Supervisory Powers*

1. *Standard of Review*

▮▮▮ Slaughter argues that his motion to dismiss the indictment for outrageous government conduct should have been granted. In substance, Slaughter contends that he was targeted for investigation because of his work as a polygraph examiner in various politically sensitive cases. A motion to dismiss an indictment based on outrageous government conduct is reviewed *de novo*. *United States v. Smith*, 802 F.2d 1119 (9th Cir.1986). An indictment should be dismissed for outrageous governmental conduct only where the government's conduct is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Citro*, 842 F.2d 1149, 1152 (9th Cir.), cert. denied, — U.S. —, 109 S.Ct. 170, 102 L.Ed.2d 140 (1988). The Court must be careful not to apply this due process "defense" so broadly that it swallows up the subjective entrapment defense. *Smith*, 802 F.2d at 1125. As a result, the court must limit this defense to conduct which "shocks the conscience." *United States v. Bogart*, 783 F.2d 1428, 1438 (9th Cir.1986). Although outrageous governmental conduct is sometimes referred to as a "defense," it is not an affirmative defense to entrapment. *United States v. Sotelo–Murillo*, 887 F.2d 176, 182 (9th Cir.1989). Rather, this "defense" is merely a claim that the government's conduct was so outrageous that due process principles require dismissal of the indictment. This issue is to be reviewed *de novo*. *United States v. Williams*, 791 F.2d 1383, 1386 (9th Cir. 1986).

2. *Discussion*

Two circuit decisions have approved the dismissal of indictments on this theory. *United States v. Twigg*, 588 F.2d 373 (3rd Cir.1978) (Government agents suggest the creation of a speed laboratory, provide expertise and secure production site); *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971) (Government supplied large quantity of ingredients, urged production of illegal liquor and was defendant's sole customer.) In *Greene* the court properly concluded that the government may not involve itself "so directly and continuously over such a long period of time [two and one-half years] in the creation and maintenance of criminal operations, and yet prosecute its collaborators." *Id.* at 787.

696

The claim of governmental outrageous conduct involves a difficult area of the law. There is no bright line between acceptable conduct and conduct which violates due process under the Fifth Amendment. Ultimately, each case must be resolved on its own facts. *Bogart,* 783 F.2d at 1438. Government agents may lawfully use methods that are neither appealing nor moral if judged by abstract norms of decency. *Bogart,* 783 F.2d at 1438. The Government may use informants and pay them. *Id.* To "win a suspect's confidence, an informant must make overtures of friendship and trust and must enjoy a great deal of freedom in deciding how best to establish a rapport with the subject." *United States v. Simpson,* 813 F.2d 1462, 1466 (9th Cir.), *cert. denied,* 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987) (court upheld continued use of informant who had sexual relations with the defendant).

■ In this case, the government's conduct in targeting Slaughter for investigation and using Antal, an attractive female, does not constitute the type of grossly shocking or outrageous conduct necessary to constitute a violation of Slaughter's Fifth Amendment rights. The trial court held a lengthy evidentiary hearing on this subject, made detailed findings, and denied Slaughter's motion to dismiss the indictment. Evidence concerning the Claiborne polygraph, the Sheriff Moran incident, and the Western Vault theft were disputed and did not give rise to the type of grossly shocking or outrageous conduct to constitute a violation of Slaughter's constitutional rights. Slaughter also contends the government's use of Antal, an attractive female, to attempt to strike up a "personal" relationship with Slaughter and to persuade him to sell cocaine also constituted outrageous conduct. Although such conduct may be unfortunate, it is not legally impermissible. In this case the trial court observed that sexual "advances," to the extent they existed and they did, graphically so, clearly came from the defendant, not from the informant. Slaughter has failed to demonstrate that the government's conduct crossed over the line into a due process violation.

Slaughter, in the alternative, asks this court to exercise its inherent supervisory power to preserve the integrity of the judicial process, and dismiss the indictment. *United States v. Owen,* 580 F.2d 365 (9th Cir.1978). For the reasons already stated, the trial court properly declined to dismiss the indictment.

Finally, Slaughter argues that the court's decision after an evidentiary hearing, to preclude the defense from presenting evidence of the government's outrageous conduct, was error. We review the trial court's ruling for abuse of discretion. *United States v. Cottier,* 759 F.2d 760 (9th Cir.1985). Slaughter's argument is without merit. The trial judge listened to testimony of more than 20 witnesses during the evidentiary hearing. Slaughter failed to establish that the investigation was motivated by improper purposes.

## B. *Denial of the Admission of Out–Of–Court Statements of Robin Kenny*

### 1. *Standard of Review*

Robin Kenny was present during the first meeting between Slaughter and Antal on April 14, 1987 when Slaughter, Antal and Robin went to Slaughter's condominium. Slaughter testified that Antal used cocaine on their first meeting on April 14. Although Slaughter was not charged with the use of cocaine during this first meeting on April 14, 1987, Slaughter argues that evidence of Antal's use of cocaine cuts to the very heart of his entrapment defense.

Robin Kenny was called by the defense as a witness and she asserted her privilege against self incrimination under the Fifth Amendment. Prior to trial, Kenny had stated to investigator Barrett of the Federal Public Defender's office on two occasions, that Kenny, Ms. Antal and Slaughter all ingested cocaine at his condominium on April 14, 1987. After Robin Kenny invoked the Fifth Amendment, the defense sought to introduce the out-of-court statements of Robin Kenny through the investigator. Admission of these statements was sought under Rule 804(b)(3), as a declaration against interest, under Rule 804(b)(5), and

under Slaughter's Sixth Amendment right to present a defense. (RT III 147). The trial court refused to admit these out-of-court statements.

A trial court's decision to exclude testimony will be reviewed for abuse of discretion. See *United States v. Roberts*, 783 F.2d 767 (9th Cir.1986).

### 2. *Discussion*

Slaughter's defense to the charges in this case was entrapment. The defense argues that evidence of Antal's use of cocaine at the first meeting on April 14, 1987 would (1) impeach the government's key witness (Antal); (2) corroborate Slaughter's testimony; (3) cast doubt on Antal's ability to recall events; and (4) most importantly, explain how Antal engaged in unauthorized criminal activity from the very inception of the case, to gain credibility with Slaughter for the very purpose of entrapment. (RT III 136, 159–160). The importance of the proffered evidence is demonstrated by the jury note sent to the judge during deliberations which asked "when Belinda first met Ray and Robin, if all three shared cocaine, by this initial meeting would this be entrapment?" (RT V 2).

■ The proper focus of an entrapment case is not the alleged misconduct of the government, but rather the predisposition of the defendant to engage in the criminal activity with which he is charged. *United States v. Benveniste*, 564 F.2d 335, 340 (9th Cir.1977). The crime charged in this case is distribution of cocaine. "The crucial question is whether the government officials implant[ed] in the mind of an innocent person the disposition to commit the alleged offense and induce[d] its commission in order that they may prosecute." *Benveniste*, 564 F.2d at 340. Entrapment is a factual issue to be decided by the trier of fact. Slaughter contends that he had the right to present all available evidence bearing on his entrapment defense.

Rule 804(b)(3) provides as follows:

**Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest; or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

The government concedes that Robin Kenny was unavailable as a witness because of her refusal to testify at trial. The question presented in this case is whether her testimony "so far tended to subject" her to civil or criminal liability, "that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." The government argues that statements by Kenny that Antal used cocaine would not be against the penal interest of Kenny and should not be admitted under Rule 804(b)(3).

In *Benveniste*, the same issues were presented. The informant Wyman testified that the defendant Benveniste brought out a sample case containing cocaine and that Benveniste, Tabb, and Meek snorted cocaine. Benveniste testified it was Tabb (rather than himself) who had the sample case of cocaine. Meek, when called to testify invoked the Fifth Amendment and refused to testify. The trial court, in *Benveniste*, refused to permit one LaJeunesse, to testify about Meek's statements to LaJeunesse that it was Tabb who had the sample case and who attempted to negotiate a cocaine sale. This court reversed in *Benveniste*, 564 F.2d at 341, for the failure to admit this testimony, reasoning as follows:

Rule 804(b) of the Federal Rules of Evidence enumerates exceptions to the general rule prohibiting the introduction into evidence of hearsay statements. Subsection (3) permits the introduction of hearsay statements if they tend to subject the declarant to criminal liability and the declarant is unavailable to testify at the

trial. Meek's assertion of her Fifth Amendment rights made her unavailable for the purpose of that rule. See F.R. Evid. 805(a)(1).

Whether her statements were actually against her penal interest is a more difficult question. That she decided to assert the Fifth Amendment lends strong support to the conclusion that her testimony would tend to subject her to criminal liability. Out of context, however, the specific statements she made to LaJeunesse which contradict Wyman would not alone be against her penal interest. We do not believe, however, that rule 804(b)(3) was intended to apply only to statements which amount to direct confessions of criminal responsibility. Otherwise Congress would not have used the broadly worded phrase "tended to subject".

As in *Benveniste*, the out-of-court statements of Robin Kenny would tend to subject her to possible criminal liability. In Nevada, it is a felony to be under the influence of a nonprescribed controlled substance (N.R.S. 453.411).

■ The admissibility of any evidence under Rule 804(b)(3) is also subject to a determination that corroborating circumstances clearly indicate the trustworthiness of the statement. *United States v. Hoyos*, 573 F.2d 1111 (9th Cir.1978). In *United States v. Oropeza*, 564 F.2d 316, 325 (9th Cir.1977), cert. denied, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978), the court indicated the following relevant factors to determine the trustworthiness of a statement:

"(a) the time of the declaration and the party to whom it was made;

(b) the existence of corroborating evidence;

(c) the extent to which the declaration is really against the declarant's penal interest; and

(d) the availability of the declarant as a witness."

Robin Kenny made the precluded statements to Barrett on two different occasions. She made the statements on January 21, 1988 and again on April 11, 1988.

(RT III 149–150). The second statement on April 11, 1988 was after she understood her statement might subject her to criminal liability. (RT III 150). The second *Oropeza* factor is satisfied because of the corroborating testimony of Slaughter that Antal used cocaine. The third factor is also satisfied because the statements could subject Robin Kenny to criminal charges in Nevada. Finally, the court ruled and the government conceded that Robin Kenny was not available as a witness at trial.

■ As in *Benveniste*, the exclusion of Robin Kenny's statements deprived Slaughter of crucial evidence of his asserted defense of entrapment and thereby deprived him of a fair opportunity to defend himself. "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). In this case, Slaughter's defense was "far less persuasive than it might have been" had he been given the opportunity to have the Robin Kenny statements presented to the jury. *Id.* at 294, 93 S.Ct. at 1045. The trial court abused its discretion in refusing to admit the statements of Robin Kenny.

The precluded statements did not constitute harmless error. Based on our review of the record, it is more probable than not that it affected the verdict. *United States v. Soulard*, 730 F.2d 1292 (9th Cir.1984); *United States v. Karr*, 742 F.2d 493 (9th Cir.1984). The prohibited evidence goes to the government's use of an informant who may have participated in unauthorized criminal activity during her first meeting with the defendant. The importance of the excluded evidence is demonstrated by the jury's note sent to the court during deliberations, where the jury asked "when Belinda first met Ray and Robin, if all there shared cocaine, by this initial meeting would this be entrapment?"

## C. *Continuing Entrapment Instruction*

### 1. *Standard of Review*

Slaughter objects to the court's refusal to give three instructions proffered by the

defense. In this circuit there are two lines of cases which establish different standards of review for determining whether a trial court improperly refused to give a requested instruction. *United States v. Hoyt*, 888 F.2d 1257 (9th Cir.1989). The first line of cases holds that the standard of review is abuse of discretion, *United States v. Busby*, 780 F.2d 804, 806 (9th Cir.1986), and the second line of cases holds the standard of review is *de novo. United States v. Brandon*, 633 F.2d 773, 778 (9th Cir.1980); *United States v. Anguiano*, 873 F.2d 1314 (9th Cir.1989). An intra-circuit conflict may be resolved through en banc proceedings. See *United States v. Sotelo–Murillo*, 887 F.2d 176, 179 (9th Cir.1989). However, the result in this case would be the same under either standard.

### 2. *Discussion*

■ The first excepted instruction dealt with the rule that predisposition to commit a crime is measured at a time before contact with the government agents. The second excepted instruction defined inducement. These concepts were adequately incorporated into the entrapment-factors instruction given to the jury. A defendant is not entitled to any particular form of instruction so long as the instructions fairly and adequately cover the defense. *United States v. Solomon*, 825 F.2d 1292 (9th Cir.1987), *cert. denied*, 484 U.S. 1046, 108 S.Ct. 782, 98 L.Ed.2d 868 (1988).

■ Defendant's proposed instruction number 22 deals with the entrapment defense in a multiple count indictment. The difficult concept of a continuing entrapment was dealt with in *United States v. North*, 746 F.2d 627 (9th Cir.1984), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 832 (1985). Like Slaughter, North was charged with a series of drug sales and raised the entrapment defense. During deliberations the North jury asked whether "entrapment must apply *in toto* or to each individual count." Over the objection of North, the court further instructed the jury on continuing entrapment as follows:

One, you may find that defendant North was entrapped in the first instance and therefore all criminal acts following were the subject of the initial entrapment;

Or you may find two, you may find that there was no entrapment and therefore none of the acts are subject to the defense of entrapment.

Three, you may find that there was ˋentrapment as to some of the acts, but no entrapment as to other of the acts.

These are questions of fact for you to determine.

*North*, 746 F.2d at 629.

In *North*, in a case of first impression, we approved the supplemental instruction on continuing entrapment because initial entrapment, assuming it exists, does not immunize a defendant from criminal liability for subsequent transactions that a defendant readily and willingly undertakes.

Slaughter requested the *North* instruction and specifically objects to the failure to give the first portion of the instruction, which instructs the jury that one possibility is that they may find that a defendant is entrapped in the first instance and "therefore all criminal acts following were the subject of the initial entrapment." In *North*, the period of illegal drug sales lasted from August 28, 1982 until September 17, 1982. In this case the jury acquitted Slaughter on the first count (distribution of cocaine on April 28, 1987) based on the entrapment defense and convicted him of the two later drug sales occurring on April 30, 1987 and May 2, 1987 (a total of 5 days after Slaughter was entrapped by the government agents.) *North* involved sales of significant quantities of cocaine in contrast to Slaughter's sale of small quantities of drugs. Further, in contrast to *North* where the government agent who tried to entrap North initially was not involved in later sales, the person (Antal) involved in the original inducement to sell drugs was later involved directly in the drug transactions which form the basis for the two convictions in this case. Finally, where in *North* the amount of drugs was substantially greater in the later sales for which he

was convicted, there was no significant difference in the amount of drugs involved in each of the transactions in this case. All of these factors weigh heavily in favor of requiring the *North* instruction in this case.

■■■ The government properly argues that inconsistent verdicts alone are not a basis for overturning convictions. *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). However, in this case, given the short period between the three drug transactions and the obvious jury confusion on the issue of entrapment, the court erred in failing to give the *North* instruction. The pattern instruction on entrapment given by the court used the language "where a person, having *no previous intention* to violate the law ... is entrapped." Under the facts of this case, the jury was not properly instructed that, given the short period of time between the entrapment and the final sale 5 days later, Slaughter was not required to show he was not predisposed to commit the subsequent offenses in order to claim the entrapment defense. Although the jury was instructed that "each charge and the evidence pertaining to it, should be considered separately," this did not adequately instruct the jury on the availability of the entrapment defense under the circumstances of this case. We conclude on the facts presented here that there is a high probability that the error materially affected the verdict. Because of the facts in this case, it is unnecessary to determine whether or not the *North* instruction must be given in every multiple count continuing entrapment case.

CONCLUSION

We reverse the defendant's convictions on Counts II and III of the indictment and remand for further proceedings consistent with this opinion.

NOONAN, Circuit Judge, concurring:

Since Samson and Delilah, sexual seduction has been a means of taking advantage of an enemy. It always involves conduct that exploits and degrades the person being used as the seducer, violates ordinary standards of sexual conduct, and necessarily implies treachery poisoning a peculiarly personal relationship. If the government were in the business of employing such means against Americans as a matter of course, I would not hesitate to condemn the government's conduct as outrageous. Justice Brandeis, dissenting, has articulated the standard: the government is the universal teacher; it should not be the teacher of dirty tricks. *Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928). The government may not be permitted by its courts to obtain criminal convictions by gross means. The war against drugs is not to be won by prostitution. In this case there is just a shadow of doubt as to what the government did, and I defer to the trial court's view that the defendant took the initiative. I would not give an imprimatur to the government's conduct, and I believe it a very close question as to whether the prosecution should have been dismissed because of the government's use of Belinda Antal. I concur in the opinion in its reversal of the judgment because of the denial of the *North* instruction.

WALLACE, Circuit Judge, concurring in part and dissenting in part:

I concur in part A of the majority disposition, but dissent from parts B and C. I would affirm the judgment of conviction.

I

We review the district court's determination of admissibility under Fed.R.Evid. 804(b)(3) for abuse of discretion. *United States v. Satterfield*, 572 F.2d 687, 690 (9th Cir.) (*Satterfield*), cert. denied, 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978). The proponent of the statement, Slaughter, must establish three elements under Rule 804(b)(3): (1) that the declarant, Kenny, was unavailable; (2) that the statement so far tended to subject Kenny to criminal liability that a reasonable person would not make the statement unless it was true; and (3) that corroborating circumstances clearly indicate the trustworthiness of Kenny's statement. *Id.* at 691.

I agree with the majority that the first *Satterfield* prong has been met: Kenny was not available. It is less clear that the statement meets the second prong of the *Satterfield* test, which requires the court to ask whether Kenny's statement was sufficiently against her penal interest to deem it trustworthy. The drafters of Rule 804(b)(3) realized the risks involved in creating an exception to the hearsay rule for statements against one's interest, and they constructed carefully designed safeguards to address these risks. The second prong of the *Satterfield* test, based upon the language of Rule 804(b)(3), is one such safeguard—it is designed to prevent suspicious or fabricated statements from being admitted. *See* Fed.R.Evid. 804 advisory committee's note.

The majority's opinion focuses almost exclusively upon the language in Fed.R.Evid. 804(b)(3) requiring that the statement must have "tended to subject" the declarant to civil or criminal liability. Although this language provides the threshold requirement for admitting a statement under the second prong of *Satterfield*, it does not eliminate the importance of the remainder of the rule: the requirement that "a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed.R.Evid. 804(b)(3). This language demands more than a showing that the declarant might have been criminally liable. It requires that the statement be made under conditions that suggest the sincerity and reliability of the declarant. Here, Kenny had sufficient time to fabricate her story. She may have implicated herself as a drug user in order to exculpate her friend Slaughter from the larger crime of distributing cocaine.

Be that as it may, it is clear that Kenny's statement failed to meet the standard imposed by the third prong of the *Satterfield* test: a statement against interest may be admitted only when "corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.* The advisory committee note to Rule 804 explicitly states that "[t]he requirement of corroboration should be construed in such a manner as to effectuate its purpose of circumventing fabrication." Our cases have interpreted this requirement to require that the party seeking admittance of the statement must show independent corroborating circumstances. In *United States v. Benveniste,* 564 F.2d 335, 341 (9th Cir.1977), for example, the statement in question was corroborated by an investigatory report and the admissions of two third party witnesses. In *United States v. Layton,* 720 F.2d 548, 560 (9th Cir.1983), *cert. denied,* 465 U.S. 1069, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1985), the offered statements were spontaneous, were corroborated by later events, and were made to a trusted advisor. We found these corroborating circumstances to be analogous to those in *Benveniste.* 720 F.2d at 560 n. 10.

Unlike the statements offered in *Benveniste* and *Layton,* the Kenny statements are not clearly corroborated by external evidence. The only corroboration is provided by Slaughter's own testimony, which fails to rise to the level of *clearly* corroborating because it is self-serving. Rather, Kenny's statements are more closely analogous to those made by the declarant in *Satterfield.* Despite finding three separate corroborating circumstances, we nevertheless concluded that discretion was not abused in denying admission; the statement was untrustworthy because other circumstances undercut the reliability of these corroborating circumstances. We emphasized that "the corroborating circumstances must do more than tend to indicate the trustworthiness of the statement; they must *clearly* indicate it." *Satterfield,* 572 F.2d at 693; *see also United States v. Ospina,* 739 F.2d 448, 452 (9th Cir.) (statements made by declarants after arrest and without spontaneity lacked sufficient corroborating circumstances), *cert. denied,* 469 U.S. 887, 105 S.Ct. 262, 83 L.Ed.2d 198 (1984); *United States v. Hoyos,* 573 F.2d 1111, 1115 (9th Cir.1978) (statements made by declarant after arrest, without spontaneity, and to a spouse who could invoke her privilege against testifying do not possess sufficient corroborating circumstances).

The circumstances surrounding Kenny's statement present an even clearer case of unreliability than the statement at issue in *Satterfield* because here there exists no reliable corroborating evidence at all. In addition, Kenny's statement was made in a situation highly suggestive of fabrication. Given the demanding requirements of Rule 804(b)(3), and the lack of any circumstances of reliability surrounding Kenny's statement, it is difficult to see how the majority can find that the district judge's refusal to admit the statement was an abuse of discretion. Because Kenny's statement does not possess the high degree of reliability required by the *Satterfield* test, I would hold that the district court did not abuse its discretion in excluding Kenny's statement.

Slaughter also argues, as he must, that the exclusion was so prejudicial that it amounted to reversible error. Kenny's statement would have assisted in impeaching Antal's testimony, but it would not necessarily have changed the outcome of his case. Reversal for nonconstitutional error depends on whether it is more probable than not that the verdict would have been different. *United States v. Soulard,* 730 F.2d 1292, 1296 (9th Cir.1984). The testimony of the cook at the Prime Rib Restaurant provided sufficient evidence to hold Slaughter guilty of selling Antal the drugs on April 30 and May 20. Therefore, even if the majority were correct in finding an abuse of discretion, I would hold that it was harmless error.

## II

I also conclude that the district court's jury instructions adequately covered Slaughter's entrapment defense. We review the district court's formulation of jury instructions, taken in their entirety, for an abuse of discretion. *United States v. Burgess,* 791 F.2d 676, 680 (9th Cir.1986). Failure to give a requested instruction is reversible error only if the instructions given did not fairly and adequately cover a defense properly raised by the defendant. *United States v. Solomon,* 825 F.2d 1292, 1295 (9th Cir.1987), *cert. denied,* 484 U.S. 1046, 108 S.Ct. 782, 98 L.Ed.2d 868 (1988).

The entrapment defense depends primarily on showing that the defendant had no predisposition to commit the crime before the government agents became involved. *United States v. Busby,* 780 F.2d 804, 807 (9th Cir.1986). The court instructed the jury on Slaughter's general entrapment defense. The court also told the jury to apply the instructions to each count separately. That is, as to their deliberations on each count, the entrapment jury instructions were to be separately and specifically applied. Slaughter contends, however, that the district court committed reversible error by refusing to give the continuing entrapment instructions formulated from *United States v. North,* 746 F.2d 627, 629 (9th Cir.1984) (*North*), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 832 (1985).

The issue before us is not whether entrapment instructions should have been given, but the necessity for additional entrapment instructions. The necessity, extent and character of supplemental instructions are within the broad discretion of the district court. *United States v. Hayes,* 794 F.2d 1348, 1351–52 (9th Cir.1986), *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987); *United States v. Rohrer,* 708 F.2d 429, 431 (9th Cir.1983).

*North* is helpful on the issue of whether further instructions were required. In *North,* the district court gave a general entrapment instruction. Then, after a question from the jury, the court supplemented its instructions specifically on how entrapment applies to multiple counts of drug distribution. The court instructed that the jury could find three possible factual situations: (1) defendant was entrapped and all following criminal acts were the subject of that entrapment; (2) defendant was not entrapped and none of the acts were subject to the entrapment defense; or (3) defendant was entrapped as to some of the acts, but not to others. We held as a matter of law that "disposition can arise and entrapment can cease in the midst of a series of drug sales." *North,* 746 F.2d at 629–30.

In the present case, the instructions given by the district court covered all three parts of the *North* supplemental instructions. Separate application of Slaughter's entrapment defense to each count of the indictment implicitly dealt with any possible confusion of multiple counts. The instructions adequately clarified the jury's duty to apply the entrapment defense to each transaction. Indeed, additional instructions may have "risked further confusion" for the jury. *See United States v. Collom,* 614 F.2d 624, 631 (9th Cir.1979), *cert. denied,* 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980). I would hold that Slaughter did not demonstrate that the district court abused its sound discretion in declining to give added instructions.