127 F.3d 1107
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Clarence Daniel DAVENPORT; Sherry Lynn Armstrong; and Lee
Armstrong, Defendants-Appellants.
 Nos. 96-30277, 96-30292, 96-30294.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Sept. 8, 1997.
Filed Oct. 17, 1997.
 
 Appeal from the United States District Court for the District of Oregon, No. CR-95-60077-MRH; Michael R. Hogan, Chief District Judge, Presiding.
 Before: CANBY, T.G. NELSON, and KLEINFELD, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Clarence Daniel Davenport ("Mr.Davenport"), Sherry Lynn Armstrong ("Mrs.Armstrong"), and Lee Armstrong ("Mr.Armstrong") appeal their convictions on multiple counts of arson, conspiracy to commit arson, making material false statements to federal agents, mail fraud, and wire fraud. All of the appellants challenge the searches of their leased property and various rulings by the district court. Mrs. Armstrong also appeals her sentence. We have jurisdiction under 28 U.S.C. § 1291. We affirm.
 
 MOTION TO SUPPRESS
 
 3
 Generally, motions to suppress are reviewed de novo. United States v. Noushfar, 78 F.3d 1442, 1447 (9th Cir.1996). We also review the district court's ruling on an individual's apparent authority to consent to a search de novo. United States v. Kim, 105 F.3d 1579, 1581 (9th Cir.1997). Because there were several entries into the appellants' building after the fire and appellants challenge each of these entries, we will address them in turn.
 
 A. The August 31 Entry
 
 4
 This search was unlawful. The district court ruled that this warrantless entry was lawful on two independent bases: (1) that an "emergency" existed due to the risk of a rekindled fire; and (2) that the appellants' landlord, Daniel Dibala, had the apparent authority to consent to the investigators' entry. Neither of these grounds can justify the August 31 entry.
 
 
 5
 In Michigan v. Clifford, 464 U.S. 287 (1984), the Supreme Court noted that "an immediate threat that the blaze might rekindle presents an exigency that would justify a warrantless and nonconsensual post-fire investigation." Id. at 293 n. 4 (emphasis added). This recognized exigency, however, cannot justify the August 31 entry. The investigators entered the building approximately six hours after the fire had been suppressed and almost four hours after the last firefighter left the scene. This hardly constitutes an "immediate threat" that the fire would rekindle. Oregon State Police Detective Merrill testified at the suppression hearing that, though there was a general risk that a fire could rekindle after the firefighters left the scene, he saw no evidence of that occurring once he entered the building. A general fear of rekindling cannot justify the warrantless entry into the appellants' leased building. "[O]nce the fire has been extinguished and the firemen have left the premises, the emergency is over." Michigan v. Tyler, 436 U.S. 499, 516 (1978) (White, J., concurring and dissenting). There was no emergency here.
 
 
 6
 Regarding Dibala's authority to consent to the entry, it is true that
 
 
 7
 a search is valid if the government proves that the officers who conducted it reasonably believed that the person from whom they obtained consent had the actual authority to grant that consent. However, the doctrine is applicable only if the facts believed by the officers to be true would justify the search as a matter of law. A mistaken belief as to the law, no matter how reasonable, is not sufficient.
 
 
 8
 United States v. Welch, 4 F.3d 761, 764-65 (9th Cir.1993) (citations omitted). However, the appellants are correct that, as a general rule, a landlord cannot consent to a search of a leased building. See, e.g., Stoner v. California, 376 U.S. 483, 490 (1964); United States v. Yarbrough, 852 F.2d 1522, 1533 (9th Cir.1988) ("A landlord generally may not give consent to the search of a dwelling rented to another."); United States v. Impink, 728 F.2d 1228, 1232 (9th Cir.1984) ("Generally, a lessor cannot consent to a search of leased premises.").[1]
 
 
 9
 An exception to this general rule exists where the landlord has "common authority" with the tenants over control of and access to the building:
 
 
 10
 [W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it ... may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected. "Common authority" rests on mutual use of the property by those generally having joint access or control so that it is reasonable to recognize that any of the parties has the right to permit inspection and others have assumed the risk that the third parties might consent to the search.
 
 
 11
 Yarbrough, 852 F.2d at 1533-34 (emphasis added) (citations omitted). See also Kim 105 F.3d at 1582 (noting that "a consent-giver with limited access to the searched property lacks actual authority to consent to a search" and that "a consent-giver whose right of access is 'narrowly prescribed' would lack sufficient authority to consent to a search."). This exception cannot validate the August 31 search in this case.
 
 
 12
 This case is not like Yarbrough where the consenting party regularly resided in the leased premises, had access to a key, stored personal property in the room occupied by the tenant, and "had complete access throughout the property in general, and to the room lived in by [the defendant] in particular." 852 F.2d at 1534. This case is also unlike Kim, where the consenting party "retain[ed] the keys on occasion" and had access to the leased premises "[a]t any time" without the renter's knowledge or permission. 105 F.3d at 1582. Before Merrill and Deputy State Fire Marshall Pratte entered the building, Dibala told Pratte that he was the appellants' landlord, had leased the entire building to the appellants, stored some personal belongings in an upstairs room, but did not possess a key and routinely asked the appellants for permission before entering the building and gaining access to his possessions. This is not sufficient evidence of mutual use or joint access to give the investigators a reasonable basis for believing that Dibala had the apparent authority to consent to the warrantless entry.
 
 
 13
 At best, this case demonstrates a mistaken belief as to the law of landlord consent and cannot, under Welch, justify the warrantless search. At the suppression hearing, the following exchange with Pratte occurred during cross-examination:
 
 
 14
 Q: All right. Have you been taught or trained that a landlord has the authority to consent to a search of a residence inhabited by a tenant who is not at home?
 
 
 15
 A: During an emergency, yes.
 
 
 16
 ....
 
 
 17
 In this instance, with the permission to enter by the building's owner, I felt that he could give us permission to do so.
 
 
 18
 Pratte apparently believed that because Dibala owned the building, he could consent to a search, at least to the portions of the building that did not constitute the Armstrongs' living area. This is plainly a mistake as to the law, not as to the facts, and cannot validate the search. The August 31 entry was unlawful.
 
 B. The September 1 Entry
 
 19
 Because the first entry was unlawful, the second entry was also unlawful. The Government cannot rely on Dibala's consent to support the second search because his consent was invalid for the first search. The Government's characterization of the second entry as a continuation of the first entry is not supported by the facts. Regardless of this theory, though, the second entry was based on the justifications for the first entry and therefore was just as unlawful.
 
 
 20
 Because the first two entries were unlawful, we must determine whether the decision to obtain the search warrant was irreparably tainted by the observations made during the entries. "To be untainted by this prior search, the officers' decision to seek the warrant must not have been 'prompted by what they had seen during [the earlier unlawful search].' " United States v. Hill, 55 F.3d 479, 481 (9th Cir.1995) (quoting Murray v. United States, 487 U.S. 533, 542 (1988)). Further, "the district court must 'explicitly find that the agents would have sought a warrant if they had not earlier entered [defendant's house].' " Id. (quoting Murray, 487 U.S. at 543).
 
 
 21
 In this case, the district court correctly found that Pratte and Merrill had ample evidence from independent sources to justify seeking a search warrant. Among other things, Merrill had obtained evidence that the appellants had recently moved personal belongings to a storage unit, Mr. Davenport had obtained renter's insurance less than ten days before the fire, Dibala was in the process of evicting the appellants, the firefighters described the fire as originating at the floor level near the Armstrongs' bed, and witnesses saw the appellants in the building shortly before the fire and leave the scene less than a minute before the fire was reported. None of this evidence was obtained as a result of the unlawful entries. Therefore, the decision to seek the search warrant was lawful.
 
 
 22
 C. The September 1 and September 2 Search Warrant Entries
 
 
 23
 Judge John D. Cable qualified as a neutral and detached magistrate. The Supreme Court has held that "an issuing magistrate must meet two tests. He must be neutral and detached, and he must be capable of determining whether probable cause exists for the requested arrest or search." Shadwick v. City of Tampa, 407 U.S. 345, 350 (1972). Judge Cable satisfied both of these requirements.
 
 
 24
 Both parties rely heavily on our opinion in United States v. Heffington, 952 F.2d 275 (9th Cir.1991). In Heffington, we stated that "[t]he Supreme Court has found an impermissible lack of neutrality in cases where the particular magistrate was also involved in law enforcement activities, had a pecuniary interest in the outcome of his decision, or had 'wholly abandoned' his judicial role." Id. at 278. Reviewing the case by "negative implication," we concluded that the facts before us did not rise to any of those levels of seriousness. Id. The same is true in this case. Judge Cable had no pecuniary interest in the outcome of his decision and did not wholly abandon his judicial role in signing the search warrant. Further, Judge Cable had absolutely no law enforcement duties. The fact that Judge Cable may have known Pratte or some of the local firefighters involved in the fire suppression does not effect his neutrality:
 
 
 25
 Assuming that an appearance of partiality may lurk in the fact that judges and police officers in rural counties often know more about the local criminal recidivists than do their more urban colleagues, we are not prepared to disqualify small-town judges on demand. Here, the appearance clearly is not so "extreme" that it constitutes a constitutional violation. Id. at 279. Judge Cable "may not have been the best possible 'neutral and detached' magistrate in" the Reedsport area to issue the search warrant, id. at 280, but there was no constitutional defect in his doing so.
 
 
 26
 The appellants also argue that without the "fruits" of the illegal entries on August 31 and the morning of September 1, there was no probable cause for the search warrant. "It is now fundamental that evidence which is obtained as a direct result of an illegal search and seizure may not be used to establish probable cause for a subsequent search." United States v. Wanless, 882 F.2d 1459, 1465 (9th Cir.1989). However,
 
 
 27
 [t]he mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant. United States v. Driver, 776 F.2d 807 (9th Cir.1985). A reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant. Id.
 
 
 28
 United States v. Vasey, 834 F.2d 782, 788 (9th Cir.1987). The magistrate's probable cause determination "will be overturned on appeal only if lacking a substantial basis." United States v. Ocampo, 937 F.2d 485, 490 (9th Cir.1991).
 
 
 29
 Merrill's three-page affidavit contains ample evidence to support Judge Cable's finding of probable cause. We are only required to excise the sentence which reads: "The majority of the damage was located in the leased living quarters of Lee and Sherry Armstrong." This is the only portion of the affidavit that has its origin in the unlawful entries on August 31 and September 1. The evidence concerning the appellants' activities in the days, hours, and minutes preceding the fire was obtained from independent, lawful sources, and is sufficiently compelling such that "any magistrate would have found probable cause for a warrant." Heffington, 952 F.2d at 279. The two searches pursuant to the search warrant were lawful.
 
 
 30
 D. Subsequent Searches Pursuant to Appellants' Consent
 
 
 31
 Though it is true that a previous illegal entry can taint and invalidate a subsequent consent to search, United States v. Howard, 828 F.2d 552, 556 (9th Cir.1987), the appellants' consent in this case was not obtained "by exploitation of [the earlier] illegality." Wong Sun v. United States, 371 U.S. 471, 488 (1963); United States v. George, 883 F.2d 1407, 1411 (9th Cir.1989). The first two entries were unlawful, but the extensive searches pursuant to the search warrant were constitutionally permissible. There can be little doubt that the lawful searches pursuant to the search warrant provide sufficient attenuation and a causal break from the first two unlawful searches to render valid the subsequent consent to search given by the appellants. Therefore, the district court correctly denied the appellants' motion to suppress.
 
 EVIDENTIARY RULINGS
 
 32
 A. Exclusion of the Testimony of Steven Wilkins
 
 
 33
 Though it is a close question, we conclude that the district court did not abuse its discretion in excluding the testimony of Steven Wilkins. The appellants argue that Wilkins' testimony was admissible under Federal Rule of Evidence 804(b)(3), which states:
 
 
 34
 (3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
 
 
 35
 Fed.R.Evid. 804(b)(3) (emphasis added). We have held that "[t]he admissibility of any evidence under Rule 804(b)(3) is also subject to a determination that corroborating circumstances clearly indicate the trustworthiness of the statement." United States v. Slaughter, 891 F.2d 691, 698 (9th Cir.1989) (emphasis added). Accord United States v. Candoli, 870 F.2d 496, 509 (9th Cir.1989).
 
 
 36
 The problem with Wilkins' testimony, which would have related statements made by Frankie Lozano regarding the April 22, 1994, vandalism of the appellants' building and vehicles, is the lack of corroboration of Lozano's statements, which formed the basis for the district court's exclusion of this evidence. On April 26, 1994, the police officer who first interviewed Wilkins about Lozano's statements summarized the material portion of the conversation as follows: "[Wilkins] said he heard Frankie Lozano bragging to other members of the class that he had been the one who had gone to the home of the Jewish people on Fir St. and had taken spray cans and marked up the walls with anti-Semitic slogans." During the appellants' offer of proof at trial, however, Wilkins was less clear about the details, stating that Lozano had said that "he and a couple other people had went down to town the night before and was spray painting the building over by the post office." On cross-examination, Wilkins conceded that he only heard bits and pieces of the conversation and might have heard the statement out of context. He also testified that he never heard Lozano talking about anything related to Judaism or anti-semitism.
 
 
 37
 The only evidence corroborating Lozano's statements was contained in a police report, following up Mr. Armstrong's April 20 complaint of criminal mischief. The report stated that on the evening of April 20, "at approximately 8:30 P.M.," the officer "observed a person that I recognized as Frankie Lozano and four other boys on skate boards playing in the area" of the appellants' building. The report also stated that "[o]n April 21, 1994, Thursday night, while in the downtown area, I saw Frankie Lozano and four other boys in the area on skate boards." The vandalism allegedly occurred during the night of April 21 and was discovered the next morning.
 
 
 38
 The statement in the police report that the officer observed Lozano and some other boys in the downtown area on the evening of April 21 is vague both as to time and specific location. There is no indication that Lozano was engaged in any illegal activity at the time he was observed by the officer, and the officer did not report seeing any of the boys carrying cans of spray paint or other instruments that could have been used in the vandalism. The fact that Lozano had been known to have engaged in "tagging" other buildings with spray-painted gang symbols does little to corroborate the statements overheard by Wilkins that Lozano was responsible for painting anti-semitic slogans on the appellants' building and vehicles. This corroborating evidence, though not without some value, does not "clearly indicate" the trustworthiness of Lozano's statements overheard by Wilkins. Therefore, the district court did not abuse its discretion in excluding Wilkins' testimony.
 
 B. Mr. Davenport's Newspaper Article
 
 39
 The problem with the admission of the Eugene Register-Guard article featuring Mr. Davenport's conversion to Judaism was that Mr. Davenport wished to call witnesses to testify to general hostile sentiment in the community rather than specific hostile acts as a result of the article's display at his workplace. The district court refused to admit the exhibit when there was no connection to specific hostile activity, but only "vague testimony about things that weren't necessarily communicated to [Mr. Davenport]." The district court explained:
 
 
 40
 I don't think it's closely enough connected. You just can't say that, put on a witness that heard comments in the community, haven't identified who they are from, anything else, that they were communicated to the defendant, and then say this is somehow admissible to show that someone else may have set the fire.
 
 
 41
 There was no factual material in the article that could not have been testified to by other live witnesses, including Mr. Davenport himself. Given Mr. Davenport's purpose for admitting the article, it was not an abuse of discretion for the district court to exclude it.
 
 C. Other Evidentiary Rulings
 
 42
 None of the other challenged evidentiary rulings by the district court warrant extended discussion. These rulings include the admission of the Deacon newspaper article; the testimony of Laura McManaway, Agent Donegan, George Liles, Chad Rial, Mark Rothert, and Karl Bender; the admission of Mr. Davenport's redacted statement to his insurance company; and the exclusion of Mr. Davenport's May 12, 1994, police report. The district court did not abuse its discretion with regard to any of these evidentiary rulings.
 
 INTERSTATE COMMERCE ELEMENT
 
 43
 There is sufficient evidence to support a conviction if, reviewing the evidence in the light most favorable to the Government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). The Government provided substantial evidence connecting the leased building to interstate commerce. The leased building was the headquarters for Echo Enterprises, the appellants' business. Between April and September 1994, the appellants made over 300 interstate telephone calls, including several to Texas where they were soliciting clients for their model construction operation. The only completed contract performed in the months preceding the fire was for a client in Texas. Solicitation of that client, the exchange of contract documents, and the transport of the completed model were all activities affecting interstate commerce directly connected to the activities within the leased building. This evidence is more than sufficient to satisfy the interstate commerce element.
 
 JURY INSTRUCTIONS
 
 44
 The appellants challenge two of the district court's jury instructions. We address them both.
 
 A. The Interstate Commerce Instruction
 
 45
 Having reviewed both the appellants' proposed interstate commerce instruction which the district court rejected and the instruction actually delivered by the district court, we can discern no material difference between them. Further, we reject the argument that the district court's instruction allowed the jury to convict the appellants merely by finding that the defendants rented the building. This argument rests on a misreading of the instruction and stretches its plain language to introduce an ambiguity where none exists. The conjunctive word "or" should be read to connect "rented" and "used." Therefore, the jury could convict the appellants if it found that they "rented ... or ... used ... that building for a[n] ... activity that affected interstate commerce."
 
 B. The Motive Instruction
 
 46
 Mr. Davenport is correct that "[a] proposed instruction regarding the appellant's theory of the case should be given if there is a foundation for it in the evidence and it is supported by the law." United States v. Tabacca, 924 F.2d 906, 912 (9th Cir.1991) (citations omitted). This does not mean, however, that the district court was required to deliver the particular motive instruction submitted by Mr. Davenport. The district court delivered the following motive instruction of its own:
 
 
 47
 Good motive alone is never a defense for the act done or committed as a crime. The motive of the defendant is irrelevant except insofar as motive may aid you in determining that defendant's intent.
 
 
 48
 This instruction, combined with the detailed instructions delivered by the district court regarding the intent elements, adequately accounted for Mr. Davenport's defense that he lacked a financial motive to commit the charged crimes.
 
 MRS. ARMSTRONG'S SENTENCE
 
 49
 "A district court's determination that a defendant was an 'organizer or leader' is reviewed for clear error." United States v. Ponce, 51 F.3d 820, 826 (9th Cir.1995). To qualify for this sentencing enhancement, "there must be evidence that the defendant exercised some control over others involved in commission of the offense or was responsible for organizing others for the purpose of carrying out the crime." United States v. Harper, 33 F.3d 1143, 1151 (9th Cir.1994) (internal quotation omitted). There can be more than one leader or organizer, and an enhancement is appropriate where the targeted individual "exercises decisionmaking authority and an organizational role." United States v. Monroe, 943 F.2d 1007, 1019 (9th Cir.1991). The evidence cited in the presentence report, amply supported by the trial record, is sufficient to justify the district court's enhancement of Mrs. Armstrong's offense level for being an organizer and leader in the perpetration of the charged crimes.
 
 CONCLUSION
 
 50
 Despite the fact that the first two entries into the burned building were unlawful, the district court properly denied the appellants' motion to suppress because the subsequent searches were lawful. The district court did not abuse its discretion with regard to any of its evidentiary rulings. Finally, there was no error with regard to the challenged jury instructions or the enhancement of Mrs. Armstrong's sentence. Therefore, we AFFIRM the appellants' convictions and Mrs. Armstrong's sentence.
 
 
 51
 AFFIRMED.
 
 
 52
 KLEINFELD, Circuit Judge, concurring in part and dissenting in part:
 
 
 53
 I concur in the majority disposition with respect to the Armstrongs. The concerns raised below would not have affected the result as to them.
 
 
 54
 With respect to Davenport, I dissent and would reverse, because of two evidentiary rulings. Because of the videotape of Sherry Armstrong walking out of the house immediately before it caught fire and substantially after she planted her purported alibi with the FBI, among other items of evidence, I do not think the evidentiary rulings discussed below could have made any difference to her case. Nor would they have with respect to Lee Armstrong. But it is possible that Davenport was used by Sherry Armstrong as a dupe, and lacked the scienter necessary for the crime. The evidentiary rulings mentioned below might have prejudiced his chances of establishing this defense.
 
 
 55
 I think it was an abuse of discretion to keep Wilkins' testimony out. Corroboration need not go so far as to make the testimony unimpeachable and merely cumulative. The corroborating circumstances need only "clearly indicate the trustworthiness of the statement." Fed.R.Ev. 804(b)(3). The statement was that Lozano "and a couple other people had went down to town the night before and was spray painting the building over by the post office." Wilkins further testified in the offer of proof that his statement as recorded in the police report was accurate. The statement was that "Frankie was bragging about being the one who had gone to the home of the Jewish people on Fir Street."
 
 
 56
 The corroboration establishing trustworthiness was that (1) the house referred to really was spray painted; (2) Lozano and others were noticed by a police officer near the house; (3) Lozano was proud of the fact that he had "done some gang tagging," that is, spray painting on property not his own; (4) Wilkins was afraid of Lozano. In light of these corroborating circumstances, Lozano's statement that he spray painted the house was trustworthy enough so that the jury should have been allowed to consider it. Sherry, after all, might have taken advantage of some events that others brought about and embellished, instead of creating the entire series of events herself.
 
 
 57
 We held in United States v. Paquio, 114 F.3d 928, 934 (9th Cir.1997), that a defendant's proposed use of 804(b)(3) testimony "raises different concerns" from prosecution use, because no constitutional right of confrontation is implicated in defense use, and a defendant's constitutional right to present witnesses in his own defense is. We also held in that case that corroboration may suffice for admissibility even though reasonable jurors might disbelieve the inculpatory hearsay. Id. at 933.
 
 
 58
 My second concern is with the newspaper article about Davenport's conversion to Judaism. The article portrays Davenport's fellow workers and Oregon small town dwellers in a bad light, as nasty anti-Semites. Though not admissible for its truth, the article would tend to establish that Davenport reasonably believed that persons outside his household burned the house down, because of community hostility in part engendered by the article. While a jury would not likely have accepted the defense theory that some stranger burned down the building, in light of the overwhelming evidence against Sherry, they might reasonably have concluded that Davenport thought fellow workers or others had burned down the building. Had he so thought, then he would have lacked scienter to commit the crimes of which he was convicted. By itself, exclusion of the article would not justify reversal, but in combination with exclusion of the Wilkins testimony, I think it does, as to Davenport.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The Government's reliance on Or.Rev.Star. § 90.332(3)(a) and (3)(b) (formerly Or.Rev.Star. § 90.335) is unavailing. Those sections give the landlord a right of access to the premises "in case of emergency" without giving notice to the tenants. As discussed above, there was no emergency here