**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Henry HEFFINGTON, Defendant–
Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Manuel Richard ESTEVES, Jr.,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William Glenn WOMBLE,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Steven Gene SILVA, Defendant–
Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kenneth Ray KIRK, Defendant–
Appellant.**

Nos. 89–10311 to 89–10315.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 16, 1991.

Decided Dec. 19, 1991.

Douglas B. Cone, Merced, Cal., Patience Milrod, Milrod & Phillips, David E. Roberts, Eric K. Fogderude, Fletcher & Fogderude, Fresno, Cal., Charlotte E. Costan, Burbank, Cal., for defendants-appellants.

Carl M. Faller, Jr., Asst. U.S. Atty., Fresno, Cal., for plaintiff-appellee.

Before GOODWIN and NOONAN, Circuit Judges, and HUPP * District Judge.

* Honorable Harry L. Hupp, United States District Judge for the Central District of California, sitting by designation.

GOODWIN, Circuit Judge:

Five defendants appeal their convictions for manufacturing, and conspiracy to manufacture, methamphetamine. They assert nine alleged defects in the trial and sentencing. Two will be discussed in this opinion; the remainder will be considered in an unpublished memorandum.

Appellants argue, *inter alia*, that the search warrant was defective because it was not issued by a neutral and detached magistrate as required by the Fourth Amendment and that certain evidence should have been suppressed because the government improperly destroyed laboratory equipment seized at the scene in violation of the Fifth and Sixth Amendments. Finding no constitutional error, we affirm as to both issues.

## I

The relevant events in this case took place on the weekend of May 13–15, 1988, at the rural mobile home residence of defendant William Womble's stepfather in Chowchilla, California. Beginning Friday evening a neighbor, Reverend Jerry Gollihar, saw Womble and the other defendants carrying a heating mantle and jugs of clear liquid into a detached garage at the mobile home residence. He also heard hissing noises coming from the garage and observed numerous unidentified persons come and go from the premises, staying only three to five minutes. These activities continued until approximately 4:30 a.m. on Sunday and Monday mornings. On Monday evening, Gollihar telephoned the Madera County Sheriff's Office and described what he had been observing. Sergeant Tom Turk and California Bureau of Narcotics Enforcement Special Agent John Balbach subsequently established a surveillance post in an orchard near the garage. The officers observed the activity at the garage through binoculars and intermittently heard the sound of a pump, which Balbach recognized as a vacuum pump commonly used in the manufacture of methamphetamine.

Turk and Balbach concluded that methamphetamine was being produced, and at approximately 3:00 a.m. they left to obtain a search warrant. Members of the Madera County Sheriff's Department continued the surveillance. At about 6:30 a.m., they observed defendant Henry Heffington's pickup truck leave the residence. Balbach followed. When the car pulled into a private drive and defendant Manuel Esteves exited, Balbach arrested him. The officers became concerned that the suspects might have become aware of the surveillance and might attempt to flee or destroy evidence. At approximately 7:00 a.m., prior to the issuance of the search warrant, Balbach went to the residence and took Womble into custody. No search was conducted until the warrant was issued.

The subsequent search of the residence revealed several plastic bags containing methamphetamine residue, a spatula with methamphetamine on it, and methamphetamine spillage on the dining room carpet. In the garage were found cans and plastic jugs containing acetone and phenyl–2–propane, a form of methamphetamine production waste. A search of Heffington's vehicle revealed a balance scale, filters, a heating mantle, funnels, rubber tubing, thermometers, flasks, plastic gloves, and a bottle of hydrochloric acid.

All five defendants were indicted and charged with two counts of violating the federal narcotics laws. Count One charged conspiracy to manufacture methamphetamine in violation of 21 U.S.C. § 841(a)(1). Count Two charged all defendants with manufacturing or aiding and abetting the manufacture of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. After a seven-day jury trial, all defendants were convicted on all counts.

## II

### A. *The Fourth Amendment Claim*

Womble challenges the search warrant issued by a state superior court judge as a violation of the Fourth Amendment requirement that a warrant be issued by a "neutral and detached magistrate." *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327, 99 S.Ct. 2319, 2324, 60 L.Ed.2d 920 (1979);

*Connally v. Georgia,* 429 U.S. 245, 250, 97 S.Ct. 546, 548, 50 L.Ed.2d 444 (1977) (per curiam); *Coolidge v. New Hampshire,* 403 U.S. 443, 449–51, 91 S.Ct. 2022, 2029–30, 29 L.Ed.2d 564 (1971). Appellants argue that Judge Moffat, who issued the warrant to search the residence of Womble's stepfather, was not neutral and detached because in 1983, while serving as a federal defender, he had represented defendant Steven Silva in another methamphetamine case in which Heffington and defendant Kenneth Kirk were co-defendants.

The Supreme Court has found an impermissible lack of neutrality in cases where the particular magistrate was also involved in law enforcement activities, had a pecuniary interest in the outcome of his decision, or had "wholly abandoned" his judicial role. The negative implication of these cases is that the facts urged by appellants do not rise to the level of a Fourth Amendment violation.

In *Coolidge,* the Supreme Court declared that a search warrant issued by the State Attorney General was invalid on the ground that he could not be "neutral and detached" because he was "engaged in the often competitive enterprise of ferreting out crime." *Coolidge,* 403 U.S. at 449, 91 S.Ct. at 2029 (quoting *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948)). Judge Moffat, in acting as a superior court judge, was not involved in any law enforcement exercise when he heard Sergeant Turk's application for the search warrant.

*Connally* and *Lo–Ji* are even less helpful to appellants than *Coolidge.* In *Connally,* the Supreme Court found that a state magistrate was not "neutral and detached" where he received a $5 fee for approving a search warrant but received no compensation where a search warrant was refused. *See Connally,* 429 U.S. at 250–51, 97 S.Ct. at 548–49. *Lo–Ji* involved a town justice who was contacted by law enforcement officers who wished him to declare two movies obscene so that they might be seized from the defendant's store. After approving a search warrant for the two films, the justice accompanied the offi-

cers to the defendant's premises. In the course of the search that followed, the justice approved the addition of hundreds more films and magazines to the existing search warrant following his review of those films. The Supreme Court concluded that the record indicated that the justice had allowed himself to "become a member, if not the leader, of the search party which was essentially a police operation." *Lo–Ji,* 442 U.S. at 327, 99 S.Ct. at 2324.

Because no one suggests that Judge Moffat was paid on a piece-work basis or that he became a member of the "search party" at the Chowchilla residence, *Connally* and *Lo–Ji,* like *Coolidge,* do not bear on our resolution of the case at bar.

Relying on *United States v. Outler,* 659 F.2d 1306 (5th Cir.1981), *cert. denied,* 455 U.S. 950, 102 S.Ct. 1453, 71 L.Ed.2d 665 (1982), Womble suggests that we look to the standards found in various disqualification and recusal statutes in an effort to give the neutrality and detachment requirement some force in this context. Title 28 U.S.C. § 455, the federal recusal statute, provides that federal judges and magistrates must recuse themselves where their impartiality "might reasonably be questioned," where they have "personal bias or prejudice concerning a party," where they have "personal knowledge" of evidentiary facts, where they were involved "in a matter in controversy" while in "private practice," or where they served in "governmental employment" and participated as counsel or adviser "concerning the proceeding." Title 28 U.S.C. § 144 provides that a judge shall be disqualified where he has "a personal bias or prejudice either against [a party] or in favor of any adverse party." Despite the differences in terminology between these two statutes, we have consistently indicated that the tests for personal bias and prejudice are identical. *See United States v. Sibla,* 624 F.2d 864, 867 (9th Cir.1980); *United States v. Carignan,* 600 F.2d 762, 764 (9th Cir.1979).

■ Womble has cited no authority for the proposition that 28 U.S.C. §§ 144 and 455 should guide the due process analysis of a search warrant issued by a state supe-

rior court judge. Even assuming that sections 144 and 455 could apply to state judges, the application of these precepts is not automatic. With regard to the "government employment" provision of section 455(b), the provision called upon here since Judge Moffat represented Silva in his capacity as a federal defender, it would be unreasonable to hold that Judge Moffat's representation of Silva in the 1983 methamphetamine case would count as involvement "concerning the matter" presented in the case *sub judice.* 28 U.S.C. § 455(b)(2). *See Chitimacha Tribe v. Harry L. Laws Co.,* 690 F.2d 1157, 1166 (5th Cir.1982) (finding no section 455(b) problem where the judge's past representation of party involved "unrelated matters"), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *Outler,* 659 F.2d at 1312 (noting that federal magistrate's issuance of a warrant did not violate due process because, at least in part, his activity in connection with the defendant's probation revocation some two years earlier as an Assistant U.S. Attorney was "wholly independent" of the probable cause determination).

We note that the portion of the "government employment" provision that deals with government attorneys turned judges who have expressed their views on the merits of a case is limited to statements on the "particular case" *sub judice.* 28 U.S.C. § 455(b)(2). Further, we also note Congress' intent in treating government attorneys differently from their colleagues in private practice and its desire not to penalize government attorneys for their service by limiting their opportunities thereafter. *See* 13A C. Wright, A. Miller & H. Cooper, *Federal Practice and Procedure,* § 3544, at 587–89 & n. 2 (1984 ed.).

More difficult, though, than this "government employment" argument is the suggestion that Judge Moffat might have received confidential information from Silva about his manufacturing efforts with co-defendants Heffington and Kirk so that he had "personal knowledge" of evidentiary facts at the warrant hearing within the meaning of section 455(b)(1). We are reluctant to accept this "personal knowledge"

speculation as fact because Womble never offered to tell the trial court or this court what confidential information he thought Judge Moffat had acquired in connection with the previous case, or how it would shed light on Sergeant Turk's affidavit, which clearly stood on its own facts.

■ Assuming that an appearance of partiality may lurk in the fact that judges and police officers in rural counties often know more about the local criminal recidivists do than their more urban colleagues, we are not prepared to disqualify small-town judges on demand. Here, the appearance clearly is not so "extreme" that it constitutes a constitutional violation.

Initially, we note that the cases demonstrate a measure of caution on the part of the courts before concluding that mere appearances of partiality have, in fact, risen to the level of constitutional error. *See Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 820, 106 S.Ct. 1580, 1584, 89 L.Ed.2d 823 (1986) (noting that "most matters relating to judicial disqualification do not rise to a constitutional level"); *Aiken County v. BSP Div. of Envirotech Corp.,* 866 F.2d 661, 678 (4th Cir.1989) (holding that a series of ex parte contacts with a judge did not "approach the magnitude of constitutional error").

Perhaps because the cases fail to provide bright-line criteria for determining whether an "appearance" has, in fact, developed into a constitutional defect, the trial court understandably was inclined toward attempting to resolve this question by determining whether or not the concept of "harmless error" applied. The trial court applied the harmless error analysis to appellant's neutral and detached magistrate claim because from all the facts before the court it was clear that any magistrate would have found probable cause for a warrant. In its written order denying Womble's motion to suppress, the district court observed that "this is not a situation where the magistrate was presented with a bare-bones affidavit making it arguably probable that the search warrant was issued solely because of the magistrate's

knowledge of the details of that previous prosecution."

Although Judge Moffat may not have been the best possible "neutral and detached" magistrate in Central California to issue the search warrant, we find no constitutional defect in the warrant he issued.

### B. *The Destruction of Evidence Claim*

■ Before trial, Silva moved the district court for an order dismissing the indictment or, in the alternative, for the suppression of certain evidence because of the government's having destroyed the laboratory equipment seized at the site. Silva complains that the government's actions constituted a violation of both the Fifth and Sixth Amendments. We review under the abuse of discretion standard a district court's refusal to suppress evidence. *United States v. Roberts*, 779 F.2d 565, 568–69 (9th Cir.), *cert. denied*, 479 U.S. 839, 107 S.Ct. 142, 93 L.Ed.2d 84 (1986). We find no error and no abuse of discretion.

■ The trial court found that a California Department of Justice analyst at the crime scene secured thirteen latent fingerprints from an array of laboratory equipment found at the scene. The only fingerprints of Silva's that were identified were found on a funnel. The latent fingerprints were preserved, and the laboratory items were then photographed. At this point, the items were declared to be "contaminated," apparently on the strength of the surveillance team's evidence that methamphetamine production had occurred at the scene and in light of the discovery of acetone and certain "waste" products. The trial court found that the items were then disposed of in accordance with "existing procedures of the Drug Enforcement Administration" for the treatment and disposal of hazardous waste.

Silva made several efforts to show how the disposal of this evidence prejudiced him. First, he suggested that the disposal of the evidence prevented him from demonstrating that the laboratory equipment did not bear any trace elements associated with methamphetamine production. Testing the items for trace materials, Silva contended, would have demonstrated that no manufacturing of methamphetamine took place on the premises. Second, examination of the funnel from which his fingerprints were taken would have demonstrated that the funnel had been used only to pour gasoline. He said the funnel would have corroborated his testimony that his activities in the garage were limited to working on his motorcycle.

Further, Silva argued that an opportunity to examine the funnel from which the fingerprints were taken would have resolved a dispute about which funnel carried Silva's fingerprints. While the fingerprint expert testified that Silva's fingerprints were taken from a glass laboratory-quality funnel of a type associated with methamphetamine production, Silva claimed that he had only touched a different funnel, a "common ordinary, everyday" funnel made of plastic which one would associate more with funneling gasoline than with methamphetamine production. Silva's claims were given some support by virtue of the fact that the expert's notes appeared to indicate that Esteves' prints were on a "glass" funnel while Silva's fingerprints were found on a funnel which is referred to as a "large, white funnel." Despite these notes, the expert testified at trial that he had taken Silva's fingerprints from a glass laboratory funnel. The trial judge resolved the factual questions against Silva's version.

■ Under the rule of *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), "the failure of a state to preserve evidence 'of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant,' is not a denial of due process of the law 'unless a criminal defendant can show bad faith on the part of the police.'" *Mitchell v. Goldsmith*, 878 F.2d 319, 321 (9th Cir.1989) (quoting *Youngblood*, 488 U.S. at 57–58, 109 S.Ct. at 337–38). Bad faith is required to make out a violation of due process because a law enforcement agency has no constitutional duty to perform any particular test. *See Youngblood*, 488 U.S. at 59, 109 S.Ct. at 338; *United States v. Van Griffin*, 874

F.2d 634, 638 (9th Cir.1989). Bad faith is shown where "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58, 109 S.Ct. at 337. A police department's compliance with "departmental procedure" should be regarded as an indication that the disposal of evidence was not performed in "bad faith." *See Mitchell*, 878 F.2d at 322 (observing, in the course of enumerating reasons for not finding bad faith, that "the police were acting in accord with their normal practices").

The trial court committed no error in its refusal to grant relief under the due process clause. The trial court specifically found that the evidence was disposed of in compliance with "departmental procedures." This routine disposal of the evidence was apparently not the product of any realization that the evidence could form a basis for exonerating the defendant. Significantly, Silva does "not claim that the government knew that [any] ... test would exculpate" him. *Van Griffin*, 874 F.2d at 638.

III

The remaining issues briefed and argued are disposed of in an unpublished memorandum. They reveal no ground for reversal.

AFFIRMED.