**UNITED STATES of America**

v.

**Douglas ELLIOTT.**

**Criminal No. 3:99CR27–02.**

United States District Court,
E.D. Virginia,
Richmond Division.

June 15, 1999.
Opinion Denying Reconsideration
Sept. 29, 1999.

attempt to liberalize the construction of § 1446(b).

Nicholas S. Altimari, Asst. U.S. Atty., U.S.Attorney's Office, Richmond, VA, for U.S.

Charles A. Gavin, White, Blackburn & Conte, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

This case is before the Court on the motion of the defendant, Douglas Elliott, to dismiss the Superseding Indictment or, alternatively, to suppress evidence that the defendant's fingerprints were found on certain physical evidence which was destroyed by the Drug Enforcement Administration ("DEA"). For the reasons set forth below, the defendant's motion is granted in part and denied in part.

## STATEMENT OF FACTS

The original Indictment in this case charged Daniel Elliott, brother of the defendant Douglas Elliott, with conspiracy to possess, manufacture and distribute methamphetamine and with other offenses. The Superseding Indictment charges both brothers with conspiracy to possess, manufacture and distribute methamphetamine and also charges Douglas Elliott with possession of methamphetamine and posses-

sion of a firearm by a convicted felon.[1] At least as early as June 1998, the Drug Enforcement Administration agent assigned to this case ("DEA Agent") and the state law enforcement authorities suspected that Daniel and Douglas Elliott were engaged in the manufacture of methamphetamine. *See* Search Warrant Aff. at pp. 2–10. The investigation continued into November and December 1998 and the activities of the brothers Elliott were monitored by law enforcement officials, federal and state.

The break in the case came on January 6, 1999 when Daniel Elliott, while driving Douglas' car, committed a traffic infraction, then attempted to elude officers and, as a result, was stopped and arrested not far from the house occupied by the brothers. At the time, Douglas Elliott was in California. The vehicle was searched incident to the arrest and the search yielded a container which held laboratory glassware, tubing and stoppers and another container which held chemicals, plastic gloves and filters. In the view of law enforcement officials, all materials in the containers were susceptible of use in the manufacture of methamphetamine.[2]

At the hearing on this motion, the DEA Agent testified that he was informed of the arrest and the search of the car by local law enforcement officials and proceeded to the scene where he visually examined the containers and their contents. According to the DEA Agent, the interior of some of the glassware was smeared with the residue of an unidentified substance, but some of the glassware did not appear to contain the smeared residue.

The glassware and the other contents of the containers in the hatchback of Douglas Elliott's car were transported to the DEA Office to be photographed and tested for the presence of fingerprints. The trans-

port from the scene of arrest to the DEA Office was not attended by any special precautions. At 2:08 p.m., January 6, 1999, the DEA Agent telephoned a private disposal contractor located in Maryland and arranged for the seized evidence to be destroyed.

Shortly thereafter, the DEA Agent prepared an application and supporting affidavit for a warrant to search the Elliott brothers' residence. The search warrant was issued at 4:50 p.m., January 6, 1999 and the residence was searched. At about 6:00 p.m. the private disposal contractor arrived at the residence to remove and dispose of the evidence seized there. It is unclear when the disposal contractor actually took possession of the items seized during the search of the vehicle, however the DEA Agent testified that, after the search of the residence was completed, the glassware was brought to the DEA Office where it was dusted for fingerprints and some fingerprints were taken. None of the glassware on which the residue appeared was tested to ascertain the chemical composition of the residue. Sometime after the fingerprints were taken, the disposal contractor, in the presence of the DEA Agent, took custody of the glassware and the other evidence seized from the vehicle. Some, or perhaps all, of the glassware was destroyed as it was thrown into containers by the private contractor. Although the glassware was photographed before it was destroyed, there are no pictures of the glassware which depict the residue or which reflect the location from which the fingerprints were lifted. There are, however, diagrams depicting the location of the fingerprints.

On January 25, 1999, the fingerprints taken from the glassware were submitted to the Federal Bureau of Investigation

---

1. Daniel Elliott has entered a plea of guilty to the conspiracy charge and is awaiting imposition of sentence.

2. On the basis of the contents of the vehicle and other information, the DEA Agent applied

for and received a warrant to search the house occupied by the brothers Elliott. The search warrant was issued at 4:50 p.m., January 6, 1999 and the house was searched later in the day.

("FBI") for fingerprint analysis. They were received by the FBI on February 1, 1999, and the FBI's analysis was completed on February 17, 1999 and subsequently returned to the DEA Agent. Identifiable fingerprints were found on two of the several pieces of glassware. Two of the fingerprints belonged to Douglas Elliott but there were other fingerprints. One of the identifiable fingerprints belonged to someone other than Douglas Elliott.

On January 29, 1999, Douglas Elliott, who had been in California since shortly before Christmas 1998, visited the police impoundment lot for the purpose of retrieving his vehicle which had been seized on January 6. When he arrived at the impoundment lot, the DEA Agent interrogated him and, according to Douglas Elliott, the DEA Agent and other agents "badgered and berated [the] defendant calling him, among other things, a 'worthless f...' and a 'schmuck.'" According to the defendant, the DEA Agent informed him that the glassware had been submitted to the laboratory and that, if Douglas'. prints were found on it, he would be arrested and indicted. The DEA Agent allegedly informed the defendant that he "had no alternative but to cooperate and to go to 'work' for him."[3] The defendant allegedly responded to that series of statements by asserting his innocence and stating that he had no idea how his fingerprints could be on any glassware which had been used to manufacture methamphetamine.

On March 3, 1999, the DEA Agent, armed with the fingerprint analysis, testified before the grand jury. A Superseding Indictment, naming Douglas Elliott as a defendant, was returned that day.

It is against this factual background which the defendant's motion to dismiss the Superseding Indictment or suppress the fingerprint evidence must be assessed.

## DISCUSSION

■ Analysis of the issues presented by the motion begins with the fundamental premise that a defendant can be convicted only upon competent evidence which leads the jury to conclude, beyond a reasonable doubt, that the defendant has committed the crimes charged against him. That premise is a cornerstone of the concept of due process of law upon which our criminal justice system is built. A corollary principle of due process is that the defendant is entitled to made aware of, and to use, all evidence which tends to exculpate him of guilt of the charges against him.[4] Also, where, as here, the Government has seized evidence which it believes is probative of guilt, the rules by which our trials are conducted make that evidence available for examination by the defendant so that he may mount any available attack upon its use against him and so that he may use it in his defense if it tends to exculpate him. Fed.R.Crim.P. 16(a). To this end, a defendant is entitled, with proper restrictions and conditions, to have evidence tested and examined so that he may make any meaningful use of any exculpatory value which it has and so that he may, if possible, counter its inculpatory effects.

■ Thus, where a piece of physical evidence is subject to both lawful and unlawful uses and the defendant's fingerprints are found on it, a defendant would be entitled to have the item tested and to present evidence that the residue of substances on the physical item of evidence is of a substance the possession or use of

3. The DEA Agent denies having used the words "worthless f..." and denies that the defendant was badgered or berated, but otherwise confirms the occurrences at the interview.

4. *Kyles v. Whitley,* 514 U.S. 419, 432, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United*

*States v. Bagley,* 473 U.S. 667, 674, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Agurs,* 427 U.S. 97, 106, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. State of Maryland,* 373 U.S. 83, 86, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

which is not unlawful. Evidence of that sort clearly would be exculpatory in a case where it is alleged that the particular physical evidence was used to effectuate an illegal purpose. Of course, testing of the residue could also provide inculpatory evidence if, for example, it disclosed that the residue was of a substance the possession of which is unlawful. Also, evidence that a defendant's fingerprints were found on an item of evidence which held the residue of an illegal substance would be inculpatory of illegal involvement with the substance. Conversely, the presence of fingerprints on an item free of such residue could be exculpatory of such charges.

On occasion, evidence useful to the prosecution or the defense, or both, sometimes is destroyed. That happened here. In such circumstances, the Supreme Court of the United States has articulated the legal principles to be applied to determine whether the destruction of evidence has deprived a defendant of due process of law.

### A. The Controlling Legal Principles

In *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the Supreme Court first set forth the framework for assessing whether the destruction of evidence deprived the defendant of due process of law.[5] The Court held that the standard of fundamental fairness required by the Due Process Clause did "not require law enforcement agencies [to] preserve [evidence] in order to introduce the results of ... tests" conducted on such evidence. *Id.* at 491, 104 S.Ct. 2528. The Supreme Court gave three reasons for reaching that conclusion. First, the evidence was not destroyed by the government "in a calculated effort to circumvent

the disclosure requirements established by *Brady v. Maryland* and its progeny;" rather, the law enforcement officers acted "in good faith and in accord with their normal practice." *Id.* at 488, 104 S.Ct. 2528. Second, the evidence was not constitutionally material. Materiality, according to the Court, meant evidence which possessed "an exculpatory value that was apparent before the evidence was destroyed" and which was of "such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489, 104 S.Ct. 2528. Finally, the likelihood that the evidence would have been exculpatory had it been preserved was small. *Id.*

Four years later, in *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988),[6] the Supreme Court refined the test articulated in *Trombetta,* holding that "unless a criminal defendant can show *bad faith* on the part of the police, failure to preserve *potentially* useful evidence does not constitute a denial of due process of law." *Id.* at 58, 109 S.Ct. 333. (emphasis added). In so holding, the Court further explained that the *mere possibility* that evidence *could* exculpate a defendant, had it been preserved, would not be sufficient to satisfy the constitutional materiality standard set out in *Trombetta.* Instead, the exculpatory value of the evidence must be *apparent,* and this must be judged based on the facts, circumstances and knowledge available to law enforcement *before* the evidence is destroyed. Therefore, "[t]he *presence or absence of bad faith* by the police for purposes of the Due Process Clause must necessarily turn on the police's *knowledge of the exculpatory value* of the evidence *at the time it was lost or destroyed."* *Id.* at

---

**5.** In *Trombetta,* the defendants had been stopped for suspected drunken driving. Each took a breathalyzer test and registered higher than 0.10 percent, an amount which carried a presumption of intoxication. Although feasible, the arresting officers failed to preserve samples of the defendants' breath.

**6.** In *Youngblood,* criminologists failed to: conduct tests on samples collected in a sexual assault kit in a timely fashion; examine a victim's clothing for semen and blood for longer than a year; and refrigerate a victim's clothing, thereby, preventing adequate testing from being performed.

56 fn* (emphasis added); *see also Holdren v. Legursky*, 16 F.3d 57, 60 (4th Cir.1994) (finding no constitutional error when government physician rendered specimens unsuitable for testing by defense experts, where there was no evidence of bad faith because physician followed standard procedures and at the time that the physician disposed of additional specimens, the exculpatory value was unknown because it had not yet been tested).

The bad faith aspect of *Youngblood* is an integral part of the application of the test announced in *Trombetta* requiring that the exculpatory value of the evidence be apparent before it is destroyed. *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir.1993). Hence, the threshold question is whether the glassware which was destroyed here had exculpatory value and whether that exculpatory value was apparent to the reasonable law enforcement agent before the glassware was destroyed.

### 1. Whether The Exculpatory Value of the Evidence Was Apparent Before it was Destroyed

■ As explained above, the Government contends that the glassware had been used for the making of methamphetamine. Indeed, the DEA Agent reached that conclusion on January 6, 1999 immediately upon observing that there was a residue of some sort on the inside surfaces of the glassware. A reasonable law enforcement officer, vested with the knowledge that the glassware could be used in making methamphetamine, would be warranted in concluding that the residue on the inside of some of the glassware might be residue of methamphetamine or the chemical compo-

nents from which it is manufactured, or both. Likewise, a reasonable agent would recognize that the fingerprints of a defendant found on glassware containing the residue of such substances would inculpate a defendant in the crime of conspiracy to manufacture methamphetamine and perhaps other related offenses.

On the other hand, a reasonable law enforcement agent would recognize that, if the residue was not that of methamphetamine or its chemical constituents, that evidence would be of exculpatory value for it would suggest a use other than an illegal one. In like fashion, the presence of fingerprints on glassware containing the residue of a lawful substance would be exculpatory or certainly lacking in the inculpatory value which would follow if the residue were of an unlawful substance.[7] And, if some of the glassware had the residue of the lawful substances and some had residue of unlawful substances, the evidentiary value would be inculpatory and exculpatory.

On this record then, it is beyond serious question that a reasonable law enforcement agent would recognize, before the glassware was destroyed, that it was of potentially exculpatory value.[8] And, without question, the exculpatory value of the destroyed evidence was significant. Thus, the first facet of the *Trombetta/Youngblood* analysis is satisfied.

### 2. Could Comparable Evidence be Obtained by Other Reasonably Available Means?

■ The second component of the *Trombetta/Youngblood* calculus also has been established. Specifically, there is no

---

7. The affidavit in support of a search warrant here indicates that the DEA Agent is quite experienced in the production and distribution of methamphetamine and is knowledgeable about the equipment used in making the substance. Likewise, the affidavit indicates that the DEA Agent was aware that the glassware could be used for lawful and unlawful purposes. Search Warrant Aff. at pp. 1–10.

8. Because a test of the residue could have yielded both exculpatory and inculpatory evidence, a law enforcement officer could conclude that the glassware lacked exculpatory value only by assuming that the residue was inculpatory. That is not a reasonable predicate for a law enforcement officer to use to destroy evidence and it certainly would not in logic support a conclusion that the evidence was not of potentially exculpatory value.

reasonably available alternative means of ascertaining the chemical contents of the residue which was observed in some of the glassware. Nor is it possible otherwise to confirm whether the two fingerprints of the defendant were located on the glassware which contained a residue or whether they were located on a piece of glassware which contained no residue. Under the circumstances presented by this record, there is no alternative evidence of those points, both of which are potentially exculpatory.

■ The Government argues that there is alternative evidence from other witnesses whom the Government intends to call in its case-in-chief. Specifically, the Government maintains that Daniel Elliott, a cooperating codefendant in this case and perhaps others, will testify that the residue was that of alcohol which had been used to wash the inside of the glassware after it had been used to make methamphetamine and that Douglas Elliott handled the glassware during the manufacturing process and thereafter. Evidence that the residue was alcohol, rather than methamphetamine or its components, is exculpatory to the extent that alcohol is not a controlled substance. That evidence also is inculpatory in perspective of the proffered testimony that the alcohol was used to conceal methamphetamine manufacture. However, the testimony of a cooperating codefendant as to the composition of the observed residue is an inadequate substitute for a chemical analysis. Moreover, that testimony would not bear at all on whether the fingerprints were located on the glassware which was observed by the DEA Agent to have contained residue or whether it was located on glassware which held no residue. Only the physical item of evidence itself would en-

able the defendant to use the exculpatory potential of the destroyed evidence.[9]

### 3. Was the Evidence Destroyed in Bad Faith?

That brings the inquiry to the bad faith component of the *Trombetta/Youngblood* test. The defendants' papers suggest that the DEA Agent acted in subjective bad faith because of the crude language and threatening conduct directed at him on January 29, 1999. The United States contends that the glassware was destroyed pursuant to official policy and that, therefore, a finding of bad faith is foreclosed. In addition, the DEA Agent testified that he erroneously thought there had been proper judicial approval for the destruction of the chemicals and the glassware. This is offered as evidence of good faith. The arguments will be addressed *seriatim*.

### a. The Agent's Statements to the Defendant

■ The DEA Agent's testimony is at odds, to some extent, with the version of matters put forth in the defendant's brief. The DEA Agent acknowledged in his affidavit and in Court that he had referred to the defendant as a "schmuck," but denied calling him any other names. And, he denies berating or badgering the defendant. The DEA Agent explained that he called the defendant a "schmuck" for allowing his brother, Daniel, to take full responsibility for their joint crimes and in an effort to secure the defendant's cooperation in undercover operations. However, there is no merit to the argument that the DEA Agent's conduct and comments are evidence of bad faith in the destruction of the evidence because they occurred almost

9. The Government also has implied that the testimony of Daniel Elliott could be considered respecting whether the exculpatory value of the glassware was apparent at the time it was destroyed. That evidence is not relevant to the inquiry whether the exculpatory value of the evidence was apparent *at the time the evidence was destroyed, Youngblood,* 488 U.S. at 56, 109 S.Ct. 333 fn* (emphasis added)

because the glassware was destroyed on the day it was seized, January 6, 1999 and Daniel Elliott did not plead guilty and become a cooperating witness until May 25, 1999. Whatever the Government may have learned from Daniel Elliott on or after May 25, 1999, is not probative respecting the apparent exculpatory nature of the residue inside the glassware on January 6.

three weeks after the evidence was destroyed.

### b. Agency Regulations and/or Policy

■ The United States seeks to explain the destruction of the glassware by relying on what is described as Department of Justice and DEA policy requiring the destruction of materials such as were found in the trunk of the defendant's car.

First, the United States points to the Department of Justice regulation promulgated at 28 C.F.R. § 50.21 (Def.Exh. B). That provision is entitled "Procedures Governing the Destruction of Contraband and Drug Evidence in the Custody of Federal Law Enforcement Authorities." According to the Department of Justice,

> This regulation is intended to prevent the warehousing of large quantities of seized contraband drugs which are unnecessary for due process in criminal cases. Such stockpiling of contraband drugs presents inordinate security and storage problems which create additional economic burdens on limited law enforcement resources of the United States.

*Id.* at § 50.21(c). In implementing this policy, the regulation governs the disposal of large amounts (referred to as threshold amounts) of contraband drugs in excess of stated representative samples. The regulation defines a representative sample to mean "the exemplar for testing and a sample aggregate portion of the whole amount seized sufficient for current criminal evidentiary practice." *Id.* at § 50.21(d)(3). Thus, the text, the policy and the definitional sections of this regulation evince a concern for retention of sufficient evidence for purposes of testing and for satisfying the requirements of due process of law.

Moreover, the regulation permits destruction only of contraband drug substances in excess of the threshold amounts or the representative samples. *Id.* at § 50.21(e). Here the residue was never tested and so there is no way to determine whether, in the first instance, the glassware even contained a substance to which the regulation applies. However, nothing in the record supports a conclusion that the amount of residue was of a quantity sufficient to activate the provisions of the regulation or even to implicate its purposes. Finally, even if the regulation were applicable (which it is not), the DEA Agent did not follow its explicit and unambiguous procedures because the regulation requires 60 days notice to the United States Attorney before destruction may be had. And, in the event of destruction, the regulation explicitly requires that the United States "[i]solate *and retain* the appropriate threshold amount of contraband drug evidence" and goes on to provide that "when less than the appropriate threshold amount of contraband drugs have been seized, the *entire amount* of the seizure is to be isolated and retained." *Id.* at § 50.21(e)(4)(emphasis added). The next section of the regulation requires that the retained portions of the contraband drugs be maintained "until the evidence is no longer required for legal proceedings." *Id.* at § 50.21(e)(5).

Considering the text of this regulation, it is clear that, even if it applies at all to the situation presented on January 6, 1999, the Government was obligated to retain the glassware for a minimum of sixty days, to give notice of its proposed destruction and to retain whatever was of evidentiary value. It is undisputed that the glassware was destroyed on the same day it was seized, that no notice was given to the United States Attorney and that no representative sample was retained. Clearly then, the Department of Justice regulation on which the Government relies provides no authority for the destruction of glassware on the facts of this case.

Apparently recognizing the difficulty of attempting to justify the destruction of this evidence on the basis of the Department of Justice regulation, the Government, alternatively, relies upon the authority conferred in that regulation upon the

DEA to issue supplemental regulations and to establish procedures consistent with the Department of Justice regulation. *See id.* at § 50.21(g). However, nothing in § 50.21(g) authorizes the DEA or any other governmental agency to destroy evidence necessary to satisfy due process or evidentiary requirements, nor does that section permit the DEA to promulgate supplemental regulations or procedures which are at odds with the clear requirements of the controlling substantive provisions of § 50.21.

■ The Government next points to the provisions of two documents which comprise Defense Exhibit A. The first of those documents is a Department of Justice Memorandum dated June 23, 1989 consisting of six pages. That memorandum bears the following subject designation: "Departmental Policy Regarding the Seizure and Forfeiture of Real Property that is Contaminated with Hazardous Waste." That memorandum, by virtue of its caption and its text, relates to the seizure and forfeiture of real property and has nothing to do with the circumstances currently before the Court or the issues presented by the defendant's motion.

However, there is one paragraph in the June 23, 1989 memorandum which the Government contends controls resolution of the issue presented by the defendant's motion. That section is found on page 6 of the June 23, 1989 memorandum, which also appears in excerpted form on the seventh page of Defense Exhibit A and it provides as follows:

DEA's current policy is that all non-evidentiary items that are discovered at a lab site are presumed to be contaminated with hazardous waste. These items are turned over to a certified hazardous waste disposal firm for safe and legal destruction. This practice provides a cost effective means of minimizing the Department's potential liability

where the items are, in fact, contaminated with hazardous waste. Federal prosecutors should refrain from instructing agents to seize and maintain custody of such items except in the extremely rare case in which an item is *absolutely essential* to proving some element of the criminal offense and there is absolutely no alternative means (e.g., videotapes) of proving that element. The enormous potential liabilities involved in storing, handling and exposing potentially contaminated materials to the public grossly outweigh any salutatory benefit to be gained by physically presenting such non-essential materials in a court of law.

Def. Exh. A at pp. 6–7 (emphasis in original).

Whatever may be said for the wisdom of the DEA policy referred to in the first sentence of that paragraph, it certainly is not authorized by virtue of 28 C.F.R. § 50.21.[10] Moreover, by its terms, the referenced DEA policy applies to "non-evidentiary items that are discovered at a lab site." The glassware here at issue does not fit that description because it was evidentiary, rather than non-evidentiary, and because it was not discovered at a laboratory site.

■ Finally, the United States relies upon the last two pages of Defense Exhibit A, which are excerpts from a Drug Enforcement Administration manual. The pertinent part of the manual on which the Government relies is addressed to raids on methamphetamine laboratory sites and appears in the section entitled "DISPOSAL." Specifically, the Government relies on subparagraph E which provides:

Chemicals of a hazardous nature will be sampled for analysis and evidentiary purposes; however, if—in the opinion of the chemist—the sampling and retention of some hazardous material may pose imminent or future danger, the sub-

---

10. The supposed DEA policy referred to was not offered in evidence here nor was it identified in any way which would permit a de-

termination whether the author of the Department of Justice Memorandum correctly reported its content.

stances will not be sampled. The remaining quantities will be given to the disposal company for proper packing and preparation for transport.... This process will include the destruction and lab-packing of all contaminated laboratory apparatus and glassware.

This section relates to chemicals of a hazardous nature and it contemplates that they will be sampled "for analysis and evidentiary purposes." That requirement, which of course was not followed here, may be avoided, under the regulation, if a chemist determines that sampling and retention of some hazardous material may pose imminent or future danger. No such determination was made here by either the DEA Agent or a chemist. In sum, that DEA policy, like the others on which the Government relies, simply does not permit the destruction of the evidence involved here.

■■ It is entirely correct, as the Government argues, that the destruction of evidence in accord with some established procedure or regulation forecloses a finding of bad faith unless there is other clear evidence to the contrary. *See e.g., Trombetta*, 467 U.S. at 488, 104 S.Ct. 2528; *United States v. Deaner*, 1 F.3d 192, 200 (3rd Cir.1993). Nor does a showing that the Government failed to follow standard procedure *ipso facto* establish bad faith. *Deaner*, 1 F.3d at 200. However, the failure to follow established procedures is probative evidence of bad faith, particularly when the procedures are clear and unambiguous as are the regulations upon which the Government relies here. And, the record is devoid of evidence that the DEA Agent acted pursuant to any applicable controlling procedure. Instead, the only procedures on which the Government here relies is found in documents which on their face, given their plain meaning and without

the need for any legal interpretation, simply do not permit the destruction of what was destroyed here.[11] To the contrary, those documents if given reasonable scrutiny by a trained law enforcement official, teach that evidence of the type here at issue ought not be destroyed because of its evidentiary value and because of principles of due process of law.[12]

■■■ The Government impliedly has argued that the destruction was the product of negligence. Ordinarily, the negligent destruction of evidence occasioned by a failure to comply with controlling authority will not give rise to a finding of bad faith. *See e.g.; Grisby v. Blodgett*, 130 F.3d 365, 371 (9th Cir.1997); *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir.1996); *United States v. Bakhtiar*, 994 F.2d 970, 976 (2d Cir.1993); *Montgomery v. Greer*, 956 F.2d 677, 681 (7th Cir.1992). However, the DEA Agent here authorized the destruction of valuable evidence within hours of its seizure, based on his unsubstantiated assumption that the items were contaminated, and without first conferring with a chemist and in contradiction to the rather plainly worded regulations requiring the preservation of evidence for due process purposes. Where, as here, there is no evidence of an established practice which was relied upon to effectuate the destruction, where the applicable documents teach that destruction should not have occurred, and where the law enforcement officer acted in a manner which was either contrary to applicable policies and the common sense assessments of evidence reasonably to be expected of law enforcement officers or was so unmindful of both as to constitute the reckless disregard of both, there is a showing of objective bad faith sufficient to establish the bad faith requirement of the *Trombetta/Youngblood*

---

11. In a hearing on a motion to suppress the evidence seized from the vehicle, the DEA Agent mentioned that destruction was required by Occupational Safety and Health Administration regulations. No evidence was offered respecting such regulations.

12. Although there is no evidence that the DEA Agent's subjective purpose in ordering destruction of the evidence was to escape the obligations imposed by *Brady v. Maryland*, that was the result, intended or not.

test. A contrary holding would permit law enforcement officials to ignore the clear text of the governing regulations on which they say their policy is predicated and to act inconsistently with it.

### c. The Supposed Judicial Authorization

■ At the hearing on the motion to suppress, the DEA Agent testified that he believed that he was permitted to destroy the glassware, because in the affidavit which supported the search warrant for the Elliot brothers' residence, he requested judicial approval to destroy those items. The search warrant affidavit provides in relevant part as follows:

> Because of the foregoing facts, [which recount the history of the investigation of the Elliott brothers and the circumstances of the January 6, 1999 arrest of Daniel Elliott and the seizure of the vehicle he was driving], the affiant has probable cause to believe that the named *premises* contain *chemicals* which either have been used or will be used in the manufacture of a controlled substance. Your affiant knows of his own experience and training and through consultation with forensic chemist in the DEA Mid–Atlantic Regional Laboratory that some or all [of the chemicals] are explosive, flammable, poisonous, or otherwise toxic in nature. Furthermore, you affiant knows that the handling of clandestine laboratory *chemicals* without proper supervision and facilities[,] has caused, in the past, explosions, fires and other events which have resulted in injuries and hea[l]th problems. Because these facts and because DEA Richmond District Office presently has no adequate safe storage facilities, your affiant *requests authorization to*

*dispose of these chemicals in proper facilities in the event of their discovery.*
Search Warrant Aff. at pp. 15–16 (emphasis added).[13] The request in the affidavit does not support the position taken by the DEA Agent because it plainly shows that he sought authorization to destroy only hazardous chemicals which he anticipated would be discovered in the residence. The request makes no reference at all to glassware and, in any event, it simply is inapplicable to the items which had already been recovered from the vehicle driven by Daniel Elliott.

Furthermore, the requested authorization to destroy was predicated upon discovery of hazardous chemicals. Here, the DEA Agent admittedly destroyed the glassware without making any attempt to determine the nature of the residue contained therein. So, even if that section of the affidavit were applicable to the glassware recovered from the vehicle (which it is not), destruction of that evidence before establishing whether any hazardous chemicals were present was improper.

In any event, the record here conclusively establishes that the DEA Agent could not have believed reasonably that he was authorized to destroy the glassware because the request for destruction of evidence was never granted. Neither the search warrant nor any other part of the record discloses judicial permission for the destruction of any items which were to be, or had been, seized.[14] Based on the foregoing, the Court concludes that the DEA Agent did not and could not, in good faith, believe that destruction of the glassware was authorized pursuant to judicial order.

### CONCLUSION

■ For the foregoing reasons, the Court concludes that the destruction of the

---

13. The affidavit is currently under seal. Unless, by June 21, 1999, the United States establishes that it is necessary for the document to remain under seal, it will be unsealed.

14. The DEA Agent testified at the hearing that approval had been issued by the Magistrate

Judge and that, in reality, permission should have been secured from a District Judge. The Magistrate Judge, however, gave no approval to destroy seized evidence. Nor could he have given such approval.

glassware deprived Douglas Elliott of due process of law within the meaning of *Trombetta* and *Youngblood.* The defendant says that the remedy for this infringement is dismissal of the Superseding Indictment, citing *Cooper,* 983 F.2d at 933; and *United States v. Belcher,* 762 F.Supp. 666 (W.D.Va.1991). On the facts of those cases, dismissal of the Superseding Indictment clearly was warranted. However, on the facts presented here, the appropriate remedy is not dismissal of the indictment but suppression of the evidence of the fingerprints. By foreclosing the ability of the Government to rely on that evidence, it is possible to neutralize the constitutional infringement from adverse effects on the trial. The defendant will be able to argue that the United States did not test the residue on the glassware and that its destruction precluded him from doing so. If the Government then is unable to introduce evidence of the defendant's fingerprints on the glassware, the defendant, although unable to prove the nature of the residue, will not linked to it.

It is so ORDERED.

## MEMORANDUM OPINION

By Memorandum Opinion and Order entered June 5, 1999, the defendant's motion to suppress evidence was granted. On July 1, 1999, the United States filed a motion for reconsideration and the defendant has replied. The parties, through counsel, have advised that they do not wish to present oral argument on the motion for reconsideration. For the reasons which follow, the motion for reconsideration is denied.

## DISCUSSION

The facts, as set forth fully in the June 5 Opinion, are incorporated by reference here. With them in mind, each grounds for reconsideration will be considered.

First, the United States argues that the destroyed evidence was not potentially exculpatory. For the reasons set forth in the June 5 Opinion, the Court remains of the view that the evidence was potentially exculpatory. Nothing in the Governments, motion for reconsideration, or the authorities on which it relies, requires a different conclusion.

Secondly, the United States argues that the exculpatory potential of the destroyed evidence was not apparent to the agent who destroyed it. Whether viewed from the standpoint of the reasonable agent or the standpoint of the particular agent involved, the potentially exculpatory value of the destroyed evidence was apparent. At the hearing on the motion, the DEA agent acknowledged that the fingerprints would be important evidence. The converse of that theorem is that the absence of fingerprints also is important evidence, particularly where, as here, the evidence was in the defendant's car which was, at the time of the seizure, driven by someone else and the defendant had been out of state for several days before the evidence was found there. The proposition that a law enforcement officer does not recognize such fundamental truths is an incredible one and it is rejected.

In like fashion, it is obvious that the nature of the substance which appears on the interior of equipment that allegedly was used in connection with the manufacture of methamphetamine could be either exculpatory or inculpatory, depending on the nature of the substance. If the residue is that of a prohibited substance, clearly it is inculpatory. If the residue is that of a non-prohibited substance or a substance that is not associated with the manufacture of methamphetamine, it is potentially exculpatory. It is incredible that a DEA agent, including this seasoned one, would not recognize these rather simple propositions.

The United States cannot be heard to contend that a law enforcement officer did not recognize or understand the obvious. That certainly is true here because there is no testimony from the officer suggesting that he did not recognize the obvious po-

tential for exculpation in the destroyed evidence. Nor should courts sanction arguments which excuse law enforcement officers from having to make an assessment of the potential utility of evidence which they destroy. That is especially true where, as here, the regulations under which the DEA agent claimed to have been acting specifically require an assessment of whether an item of evidence which is to be destroyed has evidentiary utility. Under those circumstances, the plea that a law enforcement officer does not recognize the potentially exculpatory value of destroyed evidence is tantamount to permitting the officer to plead ignorance when the controlling protocol requires that he act with knowledge. In sum, an officer who sticks his head in the sand cannot be heard to claim that the rather obvious exculpatory nature of evidence is not apparent to him.[1]

■ Third, the United States complains that the issue of bad faith was decided by applying the wrong test. The June 5 Opinion discusses the bad faith component of the appropriate test and there is no reason here to revisit that discussion. To that discussion, it is appropriate to add only the observation that the destruction of evidence without assessing its exculpatory utility is an act of bad faith when the controlling regulations: (1) clearly teach that there is a critical link between due process of law and the destruction of evidence; and (2) clearly require that: (a) an assessment of evidentiary value be made; (b) sufficient amounts of the evidence be retained for evidentiary use; and (c) the United States Attorney be consulted before destroying the evidence. Those regulations were disregarded in their entirety, and it is disingenuous for

the DEA agent here even to contend that the regulations upon which he purported to act permitted him to destroy the evidence at issue here. It is equally disingenuous of the United States to press that argument.

■ The United States seems to argue now that, although it was stupid for the DEA agent to have destroyed the evidence, it was not in bad faith because bad faith can be found only if the DEA agent actually is shown to have had a specific intent to harm the defendant when he destroyed the evidence. Viewed as a whole, neither *Trombetta* nor *Youngblood* nor their progeny require a defendant to prove that the mental state of the police officer at the time of destruction was to foreclose a defense or to deliberately deny the defendant's due process rights. Here the evidence obviously had potentially exculpatory value and the evidence was destroyed in violation of the very regulations which the United States contends authorized them to be destroyed. Acting contrary to official instructions, which the DEA agent thought to be in effect, is bad faith, whether measured objectively or subjectively. Contrary to the argument of the United States, it is not confined to the circumstance in which the DEA agent deliberately says unto himself "I shall deprive the defendant of due process or hurt his case." If that were the test, there would be no check on the destruction of evidence because law enforcement agents would be able to defend the destruction of evidence by lying about subjective intent or by violating, with impunity, the rules they are obligated to follow. If that is to be the rule, it must be established by some court other than this one. In any event, bad faith exists when conduct is knowingly engaged in or where it is reckless. *See*

---

1. Contrary to the contention advanced by the United States, the Ninth Circuit in *United States v. Heffington*, 952 F.2d 275 (9th Cir. 1991) does not control the facts here because the statement on which the United States relies is both speculative and dicta ("this routine disposal of evidence was *apparently* not the product of any realization that the evidence could form a basis for exonerating the

defendant") (*id.* at 281 (emphasis added)). Thus, *Heffington* offers no guidance on the merits of the apparency inquiry for, it assumed the lacked of apparency. In any event, *Heffington* was decided on the basis that, as the district court found, the destruction was in accord with established procedures, a circumstance which, as demonstrated in the June 5 Opinion, is not extant here.

*United States v. Leon*, 468 U.S. 897, 922–26, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (establishing the good faith exception to Fourth Amendment prohibitions but approving suppression as an appropriate remedy if the warrant was issued based on information that the "affiant knew was false or would have known was false except for his reckless disregard of the truth.") The DEA agent's conduct here was reckless.

What happened here is quite simple. The DEA agent took the measure of the evidence for his side. He admittedly recognized the inculpatory evidentiary value of the evidence. The record establishes that he either knew its potential exculpatory value or acted recklessly in failing to observe the obvious exculpatory potential of the evidence which he destroyed. He then destroyed it when the regulations which he says governed his conduct prohibited that. Under any view of the law, that is bad faith.

For the foregoing reasons, the motion for reconsideration of the United States is denied.

It is so ORDERED.